No. 19-56514

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

## OLEAN WHOLESALE GROCERY COOPERATIVE, INC., et al.,

*Plaintiffs-Appellees*,

v.

## BUMBLE BEE FOODS LLC, et al.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court for the Southern District of California, Case No. 3:15-md-02670-JLS-MDD

---

## DEFENDANTS-APPELLANTS' OPENING BRIEF

## —UNDER SEAL—

---

Christopher S. Yates
Belinda S Lee
Ashley M. Bauer
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

Gregory G. Garre
Samir Deger-Sen
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

*Counsel for Defendants-Appellants StarKist Co.
and Dongwon Industries Co., Ltd.*

*(additional counsel listed on inside cover)*

John Roberti
ALLEN & OVERY LLP
1101 New York Avenue, NW
Washington, DC 20005
(202) 683-3800

*Counsel for Defendants-Appellants Tri-Union Seafoods LLC d/b/a Chicken of the Sea International and Thai Union Group PCL*[1]

---

[1]  Chicken of the Sea International and Thai Union Group PCL join this appeal with respect to the Direct Purchaser Plaintiff class only.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants by and through their undersigned counsel, hereby certify that they have the following parent corporations or publicly held corporations owning 10% or more of their stock:

1.    For Defendant-Appellant StarKist Co.: Dongwon Industries Co., Ltd.

2.    For Defendant-Appellant Dongwon Industries Co., Ltd.: Dongwon Enterprise Co., Ltd.

3.    For Defendant-Appellant Tri-Union Seafoods LLC d/b/a Chicken of the Sea International: Thai Union North America, Inc.

4.    For Defendant-Appellant Thai Union Group PCL: None.

| | |
|---|---|
| John Roberti<br>ALLEN & OVERY LLP<br>1101 New York Avenue, NW<br>Washington, DC 20005<br>(202) 683-3800 | s/ Gregory G. Garre<br>Gregory G. Garre<br>LATHAM & WATKINS LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, DC 20004<br>Telephone: (202) 637-2207 |
| *Counsel for Petitioners-Defendants Tri-Union Seafoods LLC d/b/a Chicken of the Sea International and Thai Union Group PCL* | *Counsel for Defendants-Appellants StarKist Co. and Dongwon Industries Co., Ltd.*<br><br>*\* I certify that all parties listed concur with the filing of this brief.* |

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION............................................................4

STATEMENT OF THE ISSUES..............................................................5

STATUTORY AND REGULATORY AUTHORITIES ..........................................5

STATEMENT OF THE CASE...............................................................5

    A.    The Packaged Tuna Market.................................................5

        1.    Factors Impacting Prices Paid By Direct Purchasers ................7

        2.    Factors Impacting Prices Paid By Indirect Purchasers ..............9

    B.    This Litigation .......................................................12

    C.    The Putative Classes At Issue ..........................................14

        1.    DPP Class.......................................................14

        2.    EPP Class .......................................................15

        3.    CFP Class .......................................................15

    D.    Plaintiffs' Proffered Class-Wide Proof Of Injury ..............................16

        1.    DPP Class (Dr. Mangum) ........................................17

        2.    EPP Class (Dr. Sunding)..........................................19

        3.    CFP Class (Dr. Williams) ........................................20

    E.    Defendants' Critiques Of Plaintiffs' Models .....................................21

        1.    DPP Class (Dr. Johnson)..........................................21

**Page**

     2.     EPP Class (Dr. Haider) ...........................................................22

     3.     CFP Class (Dr. Haider) ...........................................................23

     4.     False Positives.........................................................................24

   F.     The District Court's Class Certification Order ..................................25

SUMMARY OF ARGUMENT ......................................................................26

ARGUMENT ...............................................................................................29

I.     THE DISTRICT COURT ERRED IN CERTIFYING THE CLASSES BASED ON PLAINTIFFS' USE OF REPRESENTATIVE EVIDENCE ........................................................................................29

   A.     To Satisfy Rule 23(b)(3)'s Predominance Requirement, Plaintiffs Must Show That They Can Prove Through Common Evidence That All Or Nearly All Class Members Were In Fact Injured.............................................................................................29

   B.     Averaging Assumptions That Paper Over Individualized Differences Among Class Members Are Inherently Problematic ......32

   C.     Far From Sanctioning The Use Of Representative Evidence, *Tyson Foods* Underscores The Limits On When It Is Allowed..........37

   D.     The District Court Plainly Erred In Allowing Plaintiffs To Rely On Averaging Assumptions To Establish Class-Wide Antitrust Impact ...............................................................................................41

II.    THE DISTRICT COURT ERRED IN CERTIFYING THE CLASSES WITHOUT MAKING A KEY PREDOMINANCE DETERMINATION ................................................................................48

   A.     A District Court Must Determine Whether All Of Rule 23's Requirements Are Met Before Certifying Any Class .........................48

   B.     The District Court Erred In Certifying The Classes Without First Resolving The "Battle Of The Experts" Over Class-Wide Impact ...............................................................................................50

**Page**

C.     Adopting The District Court's "Certify Now, Decide Later" Approach Would Have Far Reaching And Harmful Effects ..............57

CONCLUSION ......................................................................................60

STATEMENT OF RELATED CASES .................................................61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Express Co. v. Italian Colors Restaurant*,
570 U.S. 228 (2013)..........................................................................29

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946)..........................................................................38

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)..........................................................................58

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) .....................................................43, 55

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ..........................................................34

*Brown v. American Honda (In re New Motor Vehicles Canadian
Export Antitrust Litigation)*,
522 F.3d 6 (1st Cir. 2008)..........................................................31, 43

*Brown v. Electrolux Home Products, Inc.*,
817 F.3d 1225 (11th Cir. 2016) .......................................................53

*Comcast v. Behrend*,
569 U.S. 27 (2013)....................................................................*passim*

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978)..........................................................................58

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .............................................49, 53, 56

*In re Graphics Processing Units Antitrust Litigation*,
253 F.R.D. 478 (N.D. Cal. 2008).....................................................58

*In re High-Tech Employee Antitrust Litigation*,
289 F.R.D. 555 (N.D. Cal. 2013).....................................................55

**Page(s)**

*In re Hydrogen Peroxide Antitrust Litigation,*
  552 F.3d 305 (3d Cir. 2008) .........................................................31, 52

*Just Film, Inc. v. Buono,*
  847 F.3d 1108 (9th Cir. 2017) ............................................................29

*In re Lamictal Direct Purchaser Antitrust Litigation,*
  957 F.3d 184, 2020 WL 1933260 (3d Cir. 2020)........................54, 56

*Lewis v. Casey,*
  518 U.S. 343 (1996)...........................................................................36

*Lindsey v. Normet,*
  405 U.S. 56 (1972).............................................................................36

*Marlo v. United Parcel Service, Inc.,*
  639 F.3d 942 (9th Cir. 2011) ............................................................30

*Mazza v. American Honda Motor Co.,*
  666 F.3d 581 (9th Cir. 2012) ............................................................55

*O'Connor v. Uber Technologies, Inc.,*
  904 F.3d 1087 (9th Cir. 2018) .............................................................4

*In re Rail Freight Fuel Surcharge Antitrust Litigation–MDL
No. 1869,*
  725 F.3d 244 (D.C. Cir. 2013)......................................31, 32, 52, 54

*In re Rail Freight Fuel Surcharge Antitrust Litigation,*
  292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C.
  Cir. 2019) .........................................................................................54

*Ramirez v. TransUnion LLC,*
  951 F.3d 1008 (9th Cir. 2020) ..........................................................36

*Reinig v. RBS Citizens, N.A.,*
  912 F.3d 115 (3d Cir. 2018) ........................................................30, 41

*Robinson v. Texas Automobilie Dealers Association,*
  387 F.3d 416 (5th Cir. 2004) ............................................................43

**Page(s)**

*Sali v. Corona Regional Medical Center*,
909 F.3d 996 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1651 (2019) .................56

*Senne v. Kansas City Royals Baseball Corp.*,
934 F.3d 918 (9th Cir. 2019) ................................................................39, 40, 42

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
559 U.S. 393 (2010).........................................................................................35

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
No. CIV.A. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010).................55

*Sprint Communications Co. v. APCC Services, Inc.*,
554 U.S. 269 (2008).........................................................................................35

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier,
Inc.*,
546 F.3d 196 (2d Cir. 2008) .............................................................................56

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ..........................................................................53

*True Health Chiropractic, Inc. v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) .................30

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)................................................................................*passim*

*United Food & Commercial Workers Unions & Employers Midwest
Health Benefits Fund v. Warner Chilcott Ltd. (In re Asacol
Antitrust Litigation)*,
907 F.3d 42 (1st Cir. 2018)...................................................................32, 40, 42

*Valentino v. Carter-Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) ...........................................................................48

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................................................................................*passim*

**Page(s)**

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa
    Check/MasterMoney Antitrust Litigation)*,
    280 F.3d 124 (2d Cir. 2001) ...............................................................56

*Walker v. Life Insurance Co. of the Southwest*,
    953 F.3d 624 (9th Cir. 2020) ...............................................1, 29, 30

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ...............................................................30

*West v. Prudential Securities, Inc*,
    282 F.3d 935 (7th Cir. 2002) .........................................................53, 55

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001) .............................................................48

## STATUTES AND RULES

15 U.S.C. § 15 .........................................................................................4, 30

15 U.S.C. § 26 ............................................................................................4

28 U.S.C. § 1292(e) ....................................................................................4

28 U.S.C. § 1331 .........................................................................................4

28 U.S.C. § 1332(d) ....................................................................................4

28 U.S.C. § 1337 .........................................................................................4

28 U.S.C. § 1367(a) ....................................................................................4

28 U.S.C. § 2072(b) ..............................................................................35, 36

Federal Rule of Civil Procedure 23 .......................................1, 4, 29, 30

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and
    Technical Issues* (2d ed. 2014) ..............................................22, 34, 46

Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under
    Attack*, 156 U. Pa. L. Rev. 1649 (2008)............................................58

**Page(s)**

Richard A. Nagareda, *Class Certification in the Age of Aggregate
    Proof*, 84 N.Y.U. L. Rev. 97 (2009) ............................................................34, 49

## INTRODUCTION

Class litigation is the exception, not the rule. To meet Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement, a plaintiff must show that common issues of fact or law predominate over individual issues. That inquiry, at its core, tests whether a class is "sufficiently cohesive to warrant adjudication by representation." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (citation omitted). The Supreme Court has repeatedly stressed that, before certifying any class, district courts have an obligation to ensure that this "demanding" predominance requirement is met. *Comcast v. Behrend*, 569 U.S. 27, 33-34 (2013).

In this putative class action, Plaintiffs allege that Defendants engaged in a conspiracy to fix prices for packaged tuna products that resulted in an overcharge to direct purchasers, which was passed through to indirect purchasers as well. The district court certified three widely divergent classes: (1) hundreds of retailers, wholesalers, and distributors ranging from titans like Amazon to regional chains to single-outlet stores, who purchased packaged tuna directly from Defendants; (2) millions of individual consumers who indirectly purchased Defendants' packaged tuna for consumption from retailers large and small; and (3) thousands of individuals and companies, from large restaurant chains to small caterers, who indirectly purchased Defendants' bulk-sized tuna from certain distributors.

The undisputed evidence confirms that the members of these classes paid widely varying prices for packaged tuna. The prices paid by direct purchasers varied depending on individualized negotiations that were influenced by purchasing power, retail pricing strategy, and other factors. Likewise, whether any overcharge was passed through to indirect purchasers depended upon a multitude of individualized factors. The district court nonetheless concluded that all these dissimilar companies and indirect purchasers could pursue their antitrust claims on a class-wide basis. To reach that conclusion, the district court relied on regression models purporting to show that all or nearly all members of the putative classes were in fact injured. Those models, however, were based on concededly untrue *assumptions* that class members were affected in the same way by the alleged scheme. Most important, the models all assumed that every direct purchaser was subject to the same "average" overcharges—notwithstanding the fact that they negotiated prices on an individual basis. The models also assumed that these overcharges were uniformly passed through to indirect purchasers despite real-world evidence that pass-through rates varied and retailers often sold tuna below cost as a "loss leader."

The district court's reliance on these models in finding predominance was flawed in two fundamental respects, each of which independently warrants reversal. *First*, the Supreme Court has held that a putative class may not rely on such "representative evidence" to satisfy the predominance requirement, except where the

same evidence could sustain a liability finding in an individual action. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016). That is not the case here, as illustrated by the dozens upon dozens of lawsuits brought by direct purchasers who have chosen to proceed individually. *None* of the plaintiffs in those cases has relied on average overcharges that applied across the board to all direct purchasers. Instead, each plaintiff analyzed their own specific pricing data (available to all parties) to claim the overcharge they paid. And Defendants then challenged whether the evidence showed that the particular retailer in question actually was overcharged. By relying on the assumption of common "average" overcharges here, Plaintiffs seek to impose liability in a class proceeding using evidence with which class members could not have prevailed in their individual cases. That result is incompatible with Rule 23, the Rules Enabling Act, due process, and Article III.

*Second*, even assuming use of representative evidence were permissible here, the district court separately erred by failing to resolve a key factual dispute that bore on the predominance determination—whether there were too many uninjured class members in each class to permit certification—and, instead, referred that issue to a jury at a trial on the merits. For example, with respect to the direct purchaser class, Defendants' expert explained that, after undoing a single inappropriate assumption in Plaintiffs' model, that model was unable to show impact for nearly one-third of that class. The district court acknowledged that, if true, that would be fatal to

certification.  ER15-16.  Yet, the district court deferred that issue to a jury, reasoning that it was "'ultimately a merits decision'" and that the class should be certified because Defendants had not shown that Plaintiffs' models were "glaringly erroneous."  ER20, 24 (citation omitted).  That ruling directly contravenes the Supreme Court's repeated admonitions that a district court must determine that all of Rule 23's prerequisites are met *before* certifying a class, and, what's more, erroneously flips the burden of proof to Defendants.

The district court's certification order should be reversed.

## STATEMENT OF JURISDICTION

On July 30, 2019, the district court issued an order certifying the three classes at issue.  ER1-59.  The district court had subject-matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. §§ 15 and 26, 28 U.S.C. §§ 1331 and 1337, and 28 U.S.C. § 1332(d); and supplemental jurisdiction over EPPs' and CFPs' state-law claims under 28 U.S.C. § 1367(a).  On August 13, 2019, Defendants timely petitioned for permission to appeal the class certification order under Rule 23(f).  ER62-91.  This Court granted the petition on December 20, 2019.  ER60-61.  This Court has jurisdiction to review the district court's class certification order pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f), *see O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018), and subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 28 U.S.C. § 1332(d).

## STATEMENT OF THE ISSUES

1.  Whether plaintiffs can satisfy Rule 23(b)(3)'s predominance requirement by relying on a statistical methodology that assumes that all class members have suffered the same impact from a defendant's alleged misconduct, even when such representative evidence would not be sufficient to prove liability in any particular class member's individual case?

2.  Whether a district court is required to determine if the fact or extent of uninjured members in the class defeats predominance before certifying the class under Rule 23(b)(3), or, instead, may reserve that determination for the jury at trial?

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

All relevant constitutional and statutory authorities appear in the Addendum to this brief.

## STATEMENT OF THE CASE

### A.    The Packaged Tuna Market

Defendants are the leading suppliers of branded packaged tuna in the United States, accounting for over 80% of all branded packaged tuna sales in the country. All told, Defendants sell more than a thousand different packaged tuna products to an array of entities that vary greatly in size, buying power, and business model.

Those differences influence how direct purchasers and their customers are affected, if at all, by increases in the prices of Defendants' packaged tuna products.[2]

Critically, the prices at which Defendants' products are sold to direct purchasers are reached through individualized negotiations. When selling branded tuna, each Defendant issues a national price "list" from time-to-time that contains what are essentially the then-current sticker prices for each of its branded tuna products. However, buyers rarely (if ever) pay that list price. *See, e.g.*, ER1147 ("Q. Does [Dollar Tree] ever pay the list price? A: To my knowledge, no."); ER1120 (HEB negotiates all price increases); ER1130-31 (Price Chopper negotiates prices "constantly"); Defs.' EPP Opp'n 21 n.14 (Dkt.[3] No. 1413); ER1712-114; ER1716-17. Instead, direct purchasers typically each negotiate individually with each Defendant for substantial reductions from that Defendant's list prices. Those reductions come in many forms. *See* ER2149-50 (describing different types of reductions such as "cash discount[s]," "Billbacks," "Growth Incentive Allowances," and "pick-up allowance"); ER446 (explaining that direct purchasers "pay[] a wide range of different prices" even for the same product); *see also* ER1615, 1624-27; ER1510-11; ER1112-13, 1133-34, 1188; ER1095.

---

[2]    There are also significant differences between Defendants in terms of their size, customer perception, and market share. ER389-90 (Plaintiffs' expert explaining that each Defendant is "positioned differently" in the market).

[3]    Citations to "Dkt." refer to the docket in the lower court.

Defendants also produce "private label" products (*e.g.*, Costco's Kirkland brand) manufactured according to specifications set by a direct purchaser. Private label prices are typically set through discrete customer bids that Defendants submit in response to a customer's request for price quotations. While Defendants supply the vast majority of branded tuna products, most private label tuna is produced by manufacturers who are not parties to this case. ER216-25; ER1193-94.

### 1. *Factors Impacting Prices Paid By Direct Purchasers*

Direct purchasers of Defendants' products range from nationwide superstores—like Amazon—to local markets—like Sherm's Thunderbird Market in Medford, Oregon. And as Defendants' sales data show, the prices that direct purchasers pay for packaged tuna vary greatly for multiple reasons.

(1) ***Bargaining power.*** Direct purchasers differ substantially in their bargaining power. Conglomerates, like Amazon, Wal-Mart, and Target, have far more economic power and thus are able to negotiate much lower prices than smaller companies. *See, e.g.*, ER1612 (noting "differences in negotiating abilities over time among direct purchasers of a Defendant"); ER1458, 1465-66 (similar); ER2190 (explaining that Wal-Mart, for example, pays less than local convenience stores). Some direct purchasers, such as those who resell to food preparers or distributors, leverage the availability of non-Defendant private-label tuna to negotiate lower prices from Defendants. ER216-27; ER1049-51; ER1110-11; ER1464-65.

(2) ***Procurement strategies***. Direct purchasers use varying procurement mechanisms—including direct negotiation, brokered negotiation, and auctions—which often have a significant effect on the prices paid. *See, e.g.*, ER1178-79 (explaining Giant Eagle's auctions); ER1119 (describing HEB's bilateral negotiation process); ER1713 (explaining Kroger's online bidding auctions); ER561 (same).

(3) ***Retail strategies***. Direct purchasers frequently negotiate prices tailored to their own retail pricing model. Retailers that use an everyday-low-price strategy seek to negotiate consistently low prices from their tuna suppliers. ER2204; ER1169-70 (describing differing negotiations for different outlets, such as Food 4 Less). By contrast, retailers that employ a high/low pricing strategy may put packaged tuna on an aggressive promotion for a short period of time to bring customers into the store—or even use tuna as a "loss leader" by selling below their acquisition cost. ER2204-05, ER1627-28, 1662-63; Defs.' EPP Opp'n 27 & n.22, 28 & n.23 (Dkt. No. 1413); *see* ER1207-36 (explaining packaged tuna's role as a "loss-leader" at Albertsons, Meijer, HEB, Wakefern, CVS, and Dollar Tree). Those direct purchasers pay prices that vary significantly over time. ER1995; ER1712-13.

(4) ***Private label***. Defendants' private label and branded tuna businesses are distinct, with private label sales occurring through procurement processes separate from price negotiations for branded products. Direct purchasers typically pay much

lower prices for a can of private label tuna than for a can of branded tuna.  ER1946-47.

(5) **Purchasing priorities**.  Some direct purchasers prioritize volume and storage capacities, reliability of supply, or quality, which impact the prices they pay. *See, e.g.*, ER1182 (Giant Eagle prioritizes volume); ER1169-70 (Kroger prioritizes value more for certain locations); ER1712.

(6) **Product variation.**  Defendants offer well over a thousand distinct packaged tuna products that vary substantially in price.  ER703.  Those products differ along a number of characteristics, including type of tuna meat (white or light), cut (solid or chunk), packaging (pouch or can), size, and flavor—each of which can impact product pricing.  ER1935-44; ER1632-33, 1637-38.  Consumers in different areas of the country also have preferences for particular types of tuna, and the discounts and rebates available to direct purchasers in those areas vary accordingly.

### 2. *Factors Impacting Prices Paid By Indirect Purchasers*

The wide variation among direct purchasers not only affects the prices they pay for Defendants' packaged tuna, but also affects how much, if at all, they "pass through" any overcharge to their own customers—*i.e.*, indirect purchasers.

For instance, while a small retailer may pass through some or all of an increase in its wholesale cost, a larger retailer may not pass through *any* of its cost increase. *See* ER1102-03; ER1098; ER1094-95; ER1768-69.  Accordingly, the prices paid by

indirect purchasers—such as ordinary household consumers—can vary significantly based on the direct purchaser from whom they buy their packaged tuna. ER1644 ("[P]rices paid by members of the proposed [EPP] class for the same product in the same state varied substantially across retailers."). For example, someone who buys tuna off the shelf at a Wal-Mart undoubtedly will pay a different price from someone who buys it at a convenience store.

The following graphic illustrates the wide array of prices paid by retail consumers in California for a single 5-ounce can of StarKist tuna in 2014:



ER1068.

Different sales strategies also impact pass-through rates. Some retailers, for example, may use an everyday-low-price strategy and maintain consistently low prices even in the face of cost increases, while others may use a high/low pricing strategy that allows for more variation in response to cost increases. Retailers may also use focal point pricing to set their prices at specific points that are "sticky" and attractive to customers—for instance $1 or prices ending in 99¢. Defs.' EPP Opp'n 30 (Dkt. No. 1411); ER1203; ER1206. Trader Joe's and Harris Teeter frequently use this pricing model for packaged tuna. Defs.' EPP Opp'n 30 n.25 (Dkt. No. 1413). Some retailers use tuna as a "loss leader" to draw customers into the store and sell packaged tuna below wholesale acquisition cost. ER2204-05; ER1627-28, 1662-63;

11

Defs.' EPP Opp'n 27 & n.22, 28 & n.23 (Dkt. No. 1413). Accordingly, depending on these sales strategies, a price increase for a retailer often does not translate into a price increase for an ordinary household consumer.

Finally, as to larger indirect purchasers (such as restaurant chains), the difference in "pass through" can be attributed to the fact that such indirect purchasers negotiate individually with direct purchasers—or, sometimes, with Defendants themselves—for price reductions. And like the direct purchasers, indirect purchasers differ vastly in bargaining power, preferences, and logistics. Defs.' CFP Opp'n 18-20 (Dkt. No. 1409); ER1725-27, 1747. A large restaurant chain will pay very different prices than Bo Diddley's Pub & Deli in St. Cloud, Minnesota.

In short, the wide variation among purchasers in the packaged tuna market means that any increase in the "list" price by a manufacturer is likely to affect direct and indirect purchasers in different ways based on their individual circumstances. And because buyers all the way down the supply chain have significant market power to resist any general price increase in their individual case, a change in the list price might leave many direct and indirect purchasers entirely *un*affected.

## B. This Litigation

This litigation follows on the heels of a federal investigation into alleged price-fixing in the packaged tuna market nearly a decade ago, which ultimately resulted in several guilty pleas and criminal convictions.

In late 2010, the cost of raw tuna began to increase at unprecedented rates. ER2139-40. It is now known that sales executives from Bumble Bee, COSI, and StarKist discussed this fact and coordinated the *timing* of when each company would issue new list prices for tuna products in 2012. Ultimately, the federal investigation into these events led to guilty pleas and criminal convictions for Defendants Bumble Bee and StarKist and certain of their employees.[4]

Plaintiffs initiated this litigation in 2015, shortly after the federal investigation was announced. Three putative class actions were filed, along with dozens of individual suits brought by large and small retailers, grocery stores, and distributors. Plaintiffs in these cases alleged an antitrust conspiracy that swept far beyond the conduct that was charged and penalized as a result of the government's investigation. Plaintiffs alleged that Defendants engaged in a price-fixing conspiracy that spanned over five years (from 2010 to 2015) and covered both canned and pouch tuna. ER3.

---

[4] The guilty plea for StarKist is limited to the period between November 2011 and December 2013. Plea Agreement, *United States v. StarKist Co.*, No. 3:18-cr-00513-EMC (N.D. Cal. Nov. 14, 2018). The guilty pleas for Bumble Bee, two Bumble Bee employees, and one StarKist employee cover the period 2011 and 2013. *See* Plea Agreement, *United States v. Bumble Bee Foods LLC*, No. 3:17-cr-00249-EMC (N.D. Cal. Aug. 02, 2017); Plea Agreement, *United States v. Worsham*, No. 3:16-cr-00535-EMC (N.D. Cal. Mar. 15, 2017); Plea Agreement, *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal. Jan. 25, 2017); Plea Agreement, *United States v. Hodge*, No. 3:17-cr-00297-EMC (N.D. Cal. June 28, 2017). Bumble Bee's former CEO was convicted by a jury. Jury Verdict, *United States v. Lischewski*, No. 3:18-cr-00203-EMC-1 (N.D. Cal. Dec. 03, 2019).

The two corporate criminal pleas, by contrast, spanned less than three years (ending in 2013)—and one was limited to only canned tuna. *See, e.g.*, Plea Agreement, *United States v. StarKist Co.*, No. 3:18-cr-00513-EMC (N.D. Cal. Nov. 14, 2018).

The putative class actions and individual lawsuits were ultimately consolidated into this multidistrict litigation. ER3.

### C. The Putative Classes At Issue

Following substantial discovery, Plaintiffs sought to certify three putative classes of packaged tuna purchasers: (1) the "direct purchaser plaintiffs" or "DPPs"; (2) the "End Payer Plaintiffs" or "EPPs"; and (3) the "Commercial Food Preparer Plaintiffs" or "CFPs." All three class periods extended until at least 2015 (two years after the time period covered by the guilty pleas (2011-2013) ended) and were based on an argument that all DPPs, EPPs, and CFPs were sufficiently similarly situated to warrant class-wide adjudication.

#### 1. *DPP Class*

The DPP class is composed of "[a]ll persons and entities that directly purchased [Defendants'] packaged tuna products within the United States" from June 2011 to July 2015. DPP Cert. Mot. 1, Dkt. No. 1191. The direct purchasers within this class vary significantly—they range from large nationwide retailers, like Amazon and Walgreens, to regional grocery store chains, like Piggly Wiggly and Stater Bros. Markets, to smaller grocery or specialized food stores, like Sherm's

Thunderbird Market. The DPP class also includes both large and small distributors and wholesalers.[5]

### 2. EPP Class

The EPP class is composed of many millions of individuals who indirectly purchased Defendants' packaged tuna for personal consumption from June 2011 to July 2015. This class is defined to include consumers in 30 States (plus D.C. and Guam) who bought Defendants' packaged tuna in "cans or pouches smaller than forty ounces for end consumption." *See* EPP Cert. Mot. 4-5 (Dkt. No. 1130-1). All told, the EPP class members purchased billions of Defendants' packaged tuna products from stores across the country. *Id.* at 8.

### 3. CFP Class

The CFP class is composed of individuals and commercial entities who indirectly purchased Defendants' bulk-sized packaged tuna products from June 2011 through December 2016. This class is defined to include purchasers in 27 States (plus D.C.) who bought packaged "tuna products in packages of 40 ounces or more"

---

[5] More than 100 direct purchasers such as Wal-Mart and Target (the "Direct Action Plaintiffs" or "DAPs") filed their own, individual complaints and are thus not part of the DPP case—even though they fall within the class definition. StarKist and COSI have reached settlements with nearly all of the DAPs. *See, e.g.*, Dkt. Nos. 1872, 1886 (Target); Dkt. Nos. 1202, 1826 (Wal-Mart); Dkt. Nos. 1871, 1884 (Sysco); Dkt. Nos. 1909, 1914 (CVS); Dkt. Nos. 1916, 1928 (Wegmans). And Bumble Bee settled with certain DAPs prior to seeking bankruptcy protection. *See, e.g.*, Dkt. No. 1887 (Target); Dkt. No. 1915 (Wal-Mart); Dkt. No. 1838 (Sysco).

from one of six large direct purchasers (retailers Wal-Mart, Sam's Club, and Costco, and food service distributors Sysco, US Foods, and DOT Foods). CFP Cert. Mot. 2-3 (Dkt. No. 1143-1). The CFP class includes both food preparers that purchased packaged tuna for their own menu items—*e.g.*, delis, caterers, restaurants, and nursing homes—and distributors who purchased packaged tuna for resale—*e.g.*, Aramark, the largest U.S.-based food service company.

### D.    Plaintiffs' Proffered Class-Wide Proof Of Injury

In markets characterized by individualized negotiations and the other factors discussed above, injury—in the form of improper overcharges to direct purchasers and passed-through overcharges to indirect purchasers—does not automatically follow from a price-fixing conspiracy, even when one exists. Certain direct purchasers may have sufficient market power to resist any attempted price increase; and some direct purchasers may choose not to pass through any price increase to their own customers. Given the innumerable individualized differences among class members with respect to their bargaining power and other factors, Plaintiffs faced a difficult hurdle in showing that they could establish injury through *class-wide proof*.

In an effort to meet that burden, Plaintiffs relied on statistical models presented by various experts that purported to show class-wide impact. Although each expert's methodology differed slightly, they all used regression models that purported to calculate average "overcharges" for all direct purchasers. An

"overcharge" is the difference between the price that is actually paid and the price that would have been paid absent the alleged conduct. While the three experts derived different overcharge percentages from their respective models for the different classes, all three methodologies relied on averaging assumptions. For example, DPPs' model *assumed* that all direct purchasers were overcharged by an identical amount that was equivalent to the claimed "average" overcharge of the direct purchasers as a whole. EPPs' and CFPs' experts also used averages to calculate claimed overcharges to direct purchasers and then used a second set of averaging assumptions in an attempt to calculate the rates at which the assumed average overcharges were passed through to indirect purchasers.

In other words, despite the enormous differences among class members and the individualized nature of price negotiations in the packaged tuna market, Plaintiffs' models assumed that every direct purchaser incurred the *same* average overcharges on all packaged tuna purchases, and that every end purchaser was subject to the *same* average rates of pass-through.

### 1. *DPP Class (Dr. Mangum)*

Plaintiffs' expert, Dr. Russell Mangum offered a multi-step analysis for determining class-wide impact for members of the DPP class.

*First*, he developed a regression model that pooled all direct purchasers to calculate a 10.28% average overcharge, which he then assumed was paid by *every*

direct purchaser in the entire class. Dr. Mangum did not calculate the actual overcharges for each of the direct purchasers. Indeed, Dr. Mangum conceded that it would be impossible to use his regression model to calculate an overcharge for 61 direct purchasers—10% of the DPP class—because they did not make purchases during the time periods required by his before-and-after model. ER1351; ER627-29, 720-23; ER1030.

*Second*, Dr. Mangum used that same model to come up with "predicted actual prices" paid by all direct purchasers. Dr. Mangum's predicted actual price for a given product was the same for all direct purchasers in a state in a given month, notwithstanding the evidence showing substantial variation in the prices that were, in fact, paid by individual direct purchasers and in individual transactions. ER1476; ER1017-23. Dr. Mangum then subtracted the assumed common overcharge of 10.28% from the predicted actual price he used for each transaction. ER2013-14; ER711-14; ER1474. This figure yielded what Dr. Mangum described as the "predicted but for" price for each transaction—*i.e.*, the price his model predicted each purchaser should pay if not for the alleged conspiracy. Dr. Mangum then compared this "predicted but for" price with the *actual* prices that each direct purchaser paid on their purchases. If the predicted but-for price was lower than the actual price for even a single transaction in the class period, Dr. Mangum considered that purchaser "injured." ER2018-19.

Using this approach, Dr. Mangum concluded that the alleged conspiracy impacted 94.5% of the DPP class—and did not impact 5.5% of the class. ER2019. In other words, for 5.5% of the class, the actual price paid was actually lower (for every transaction) than the price Dr. Mangum's model predicted the purchaser should have paid absent the alleged conspiracy.

### 2. *EPP Class (Dr. Sunding)*

Plaintiffs' expert, Dr. David Sunding, attempted to analyze class-wide impact for members of the EPP class in two steps.

*First*, like Dr. Mangum, Dr. Sunding used regression models in an attempt to show impact for all direct purchasers (*i.e.*, the retailers from whom EPPs bought tuna). Dr. Sunding's methodology also assumed average overcharges commonly affected all purchases for every direct purchaser.[6] And Dr. Sunding acknowledged that when he tested his models, they were incapable of calculating positive overcharges for all direct purchasers. ER353-55. When retailers such as Costco, Target, and Piggly Wiggly were broken out individually, Dr. Sunding's own analysis demonstrated that none of them was impacted. ER398-400. This lack of overcharge for *direct* purchasers is important to the EPP impact analysis because, if

---

[6] Dr. Sunding developed three models to estimate an average overcharge to direct purchasers of 4.5% from StarKist, 9.4% from Bumble Bee, and 8.1% from COSI. ER2191-92.

a direct purchaser was not overcharged, then there was no overcharge that could have been "passed through" to the end purchaser.  ER452-59, 461-67; ER1074-81.

*Second*, Dr. Sunding estimated the extent to which the average overcharges to direct purchasers were passed through to EPPs.  To do so, he calculated the rates at which price increases in the packaged tuna market are passed on from direct purchasers to indirect purchasers *generally*.  He did not attempt to account for the significant variation in pass-through rates across products or over time.  Nor did his model attempt to account for real-world retailer pricing strategies, such as the use of focal price points or loss leaders.  Instead, he assumed the same pass-through rate for all retailers.  That is, he assumed a superstore like Wal-Mart passed through an overcharge at exactly the same rate as a local grocery like Sherm's Thunderbird Market in Medford, Oregon, and that this uniform pass-through rate remained exactly the same for more than four years.  ER2229.[7]

### 3.    *CFP Class (Dr. Williams)*

Plaintiffs' expert, Dr. Michael Williams, also analyzed impact to the CFP class in a similar two-step process.  He first used regression models to estimate average overcharges to six specified direct purchasers, and he then attempted to

---

[7]    Dr. Sunding calculated average pass-through rates to the EPP class ranging from 65.3% to 135%, depending on the direct purchaser and location.  ER1629-30, 2212, 2284-320.  Dr. Sunding then assumed a uniform pass-through rate of 100% for all sales to the EPP class.  ER2229.

estimate pass-through rates to the class members. Dr. Williams, too, relied on averaging assumptions at both of these steps. ER1861; ER1732-35, 1767-68 & n.94. And he, too, admitted that his models were incapable of calculating individual overcharges. ER129-30, 133.[8]

### E. Defendants' Critiques Of Plaintiffs' Models

In opposing class certification, Defendants challenged the class experts' reliance on averaging assumptions that hypothesized that all direct purchasers paid the exact same average overcharges. Defendants similarly criticized the indirect purchasers' experts' use of averaging assumptions in calculating pass-through rates. To do so, Defendants retained their own experts: Dr. John Johnson for the DPPs' methodology and Dr. Laila Haider for the EPPs' and CFPs' methodologies.

#### 1. *DPP Class (Dr. Johnson)*

To illustrate the biasing effect of Dr. Mangum's averaging assumptions, Dr. Johnson ran Dr. Mangum's model with only one modification: Instead of calculating only a single average overcharge, Dr. Johnson allowed the overcharge to vary for each direct purchaser.[9] ER718-19, 663; ER1026. When this variance was

---

[8] Dr. Williams calculated an average overcharge to the six large distributors of 18.2% from StarKist, 15.3% from Bumble Bee, and 16.6% from COSI. ER1860. Dr. Williams calculated average pass-through rates to the CFP class ranging from 92% to 113%. ER1863.

[9] Dr. Mangum himself ran this same modification to test the robustness of his model by looking at Wal-Mart as an individual direct purchaser. ER2017-18;

allowed for the entire class, Dr. Johnson determined that Dr. Mangum's model was unable to show any impact at all to 28% of the class—that is, for 169 DPP class members (including both large entities like Trader Joe's and smaller entities like Cento Fine Foods in New Jersey). ER1479-81; ER1027; ER718-24. As Defendants explained, 28% of a class—nearly one-third—far exceeds the *de minimis* number of uninjured class members that some courts have permitted in certifying a class. Defs.' DPP Opp'n 11-14 (Dkt. No. 1514) (citing cases).[10]

> **2.** *EPP Class (Dr. Haider)*

Defendants also challenged Dr. Sunding's reliance on averaging to calculate both overcharges and pass-through rates.

*First*, Defendants explained that Dr. Sunding's assumption of "blanket overcharge[s]" for all direct purchasers "obscures the absence of impact to large

---

ER663-64. Moreover, it was a modification that a standard statistical test used to determine whether the pooling of data is appropriate (known as the "Chow test") indicated was necessary. ER1490 & n.112; ER715-16; ER1031; ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* § 13.B.1.c.2 (2d ed. 2014) (describing Chow test as a "standard statistical test" used "to determine whether it is appropriate to pool" data).

[10] Dr. Johnson also explained that Dr. Mangum is able to find that 5.5% of the class suffered no impact only because "his regression model does a particularly poor job of estimating the 'predicted actual price.'" ER1476; *see also* ER712-15. In other words, Dr. Johnson concluded that "Dr. Mangum's model 'over-predicts'" the actual prices for certain purchases "so when it subtracts the 10.28 percent overcharge, it still shows that [the purchaser] paid a price below that which would have prevailed in the but-for world." ER1474-76 (explaining that Dr. Mangum's model mispredicted the per-can price for Ralphs by almost 13¢—nearly 20% of Ralphs' actual per-can price).

segments of the class." Defs.' EPP Opp'n 20 (Dkt. No. 1411). To illustrate the effect of averaging on Dr. Sunding's results, Dr. Haider—much like Dr. Johnson—ran Dr. Sunding's models but allowed the overcharges to vary by direct purchaser. ER1620-21. The results showed that Dr. Sunding's use of averaging concealed the model's inability to show overcharges for 21.1%, 24.1%, and 32.7% of direct purchasers from StarKist, Bumble Bee, and COSI, respectively. *Id.* These individual overcharge results also showed *negative* overcharges for many large direct purchasers, including Target, Costco, and Kroger. ER454-57; ER1079.

*Second*, Defendants criticized Dr. Sunding's use of averages to calculate pass-through rates. Defs.' EPP Opp'n 27-33 (Dkt. No. 1413). Defendants argued that Dr. Sunding's model was particularly flawed because it simply adopted a uniform pass-through rate for all of the many millions of individual EPPs—and their collective billions of purchases. That uniform rate, Defendants explained, ignored both Dr. Sunding's own varied estimates of pass-through, as well as the substantial "real-world evidence" of pass-through variation. *Id.* at 28; ER1209-24; ER516-17.

### 3. *CFP Class (Dr. Haider)*

Finally, Defendants also challenged Dr. Williams' use of averaging assumptions to estimate both overcharges and pass-through rates.

Defendants explained that "Dr. Williams' pass-through model shows only average overcharges and thus ignores, and disguises, important characteristics of the

putative class." Defs.' CFP Opp'n 2 (Dkt. No. 1409). Defendants identified this as a "foundational problem" with Dr. Williams' model that "guarantees common impact by smoothing over key differences among class members." *Id.* at 19, 2. Additionally, Defendants explained that Dr. Williams' model did not account for the fact that CFPs include both food preparers and distributors—the latter of which may have passed the alleged overcharge "down the distribution chain." *Id.* at 2-3. Nor did it account for the fact that numerous CFPs negotiated prices directly with Defendants—as opposed to with distributors. Defs.' CFP Opp'n 18-19 (Dkt. 1409).

Defendants explained that Dr. Williams' model was also flawed in that it just "*assumes* a common pass-through across members of the proposed class over time, by identifying an average pass-through of costs generally, rather than the pass-through of the alleged overcharge." *Id.* at 23.

### 4.    *False Positives*

Defendants' experts also showed that DPPs' and CFPs' models resulted in "false positives"—*i.e.*, impact where there could not logically be any. Specifically, Dr. Mangum's DPP model detected overcharges on packaged tuna purchases (1) outside of the conspiracy period and (2) from non-Defendant packaged tuna suppliers. *See* ER1478-79 & n.65, 1471 & n.50; ER735-37, 741-42; ER1047-52, 1061-63; Defs.' DPP Opp'n 14-16 (Dkt. No. 1514). Dr. Williams' CFP model likewise detected overcharges on packaged tuna purchases from non-Defendant

24

packaged tuna suppliers. ER1738-39; ER229-34; ER1197; Defs.' CFP Opp'n 20-21 (Dkt. 1409).

## F.    The District Court's Class Certification Order

Following a three-day hearing, the district court issued an order certifying all three of the putative classes discussed above. ER58.

The district court agreed with Defendants that the "most important[]" issue at class certification was whether the class experts' methodologies could measure class-wide impact "on a common basis," such that they satisfied Rule 23(b)(3)'s predominance requirement. ER12. The district court focused its analysis on the DPP class. The district court noted that when Dr. Johnson re-ran Dr. Mangum's model to allow for variation among class members, he found the model unable to show impact for at least 28% of the class. ER15-16. The court recognized that a "model unable to show impact to over 28% of the class members would unquestionably" fail to satisfy Rule 23(b)(3)'s predominance requirement. ER16.[11]

But instead of determining whether Dr. Johnson's critique of Dr. Mangum's model was correct, the district court deferred that question for consideration by a jury at trial. In the district court's view, "determining which expert is correct [was]

---

[11]  The district court mistakenly referred to "Dr. Johnson's model." ER16. Because Plaintiffs bear the burden of establishing predominance, Defendants did not need to (and did not) introduce their own independent *models*. Rather, as explained above, Defendants' experts evaluated the shortcomings of Plaintiffs' models.

beyond the scope" of class certification and was "'ultimately a merits decision'" for the jury. ER23-24 (citation omitted). And despite acknowledging that Dr. Johnson's criticisms of Dr. Mangum's model were "serious," the district court concluded that Defendants had failed to show that the model was so "glaringly erroneous" as to be "unreliable." ER20, 23; *see also* ER19 (finding Dr. Johnson's criticisms were "ripe for use at trial but, at this stage, [we]re not fatal to a finding of class-wide impact"). The district court rejected Defendants' similar challenges to EPPs' and CFPs' models for the same reasons. ER51, 35.

The district court then dismissed Defendants' criticism of the use of averaging in calculating pass-through rates for indirect purchasers for a similar reason: that the criticism was nothing more than "disagreements among the experts about what data should be" rather than one about "flaws," ER38 (Dr. Williams' model), or "underlying problems" in the methodologies, ER53 (Dr. Sunding's model).

This Court granted Defendants' Rule 23(f) petition for review. ER60.

## SUMMARY OF ARGUMENT

The extraordinarily large size and highly varied membership of the putative classes at issue always made this a suspect case for class certification. In

26

nevertheless certifying the putative classes at issue, the district court committed two fundamental errors, each of which independently requires reversal.

I.  The district court held that Plaintiffs could show class-wide impact, and thus satisfy Rule 23(b)(3)'s predominance requirement, based on representative evidence that uses averaging assumptions.  Such assumptions, however, improperly paper over individualized differences among class members, and accordingly are inherently problematic in making class-wide showings.  In *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016), the Supreme Court held that representative evidence is allowed to meet the requirements of Rule 23 only where it would be sufficient to establish liability in an individual action.

That is not the case here.  Unlike in *Tyson Foods,* there is no substantive law permitting reliance on representative evidence in proving injury in individual antitrust cases.  Rather, the averaging assumptions on which Plaintiffs' experts relied here serve only to gloss over individualized differences among class members as to negotiating power and other factors affecting the price paid, which make this case fundamentally unsuitable for class-wide resolution.  Tellingly, none of the class members that have filed individual suits against Defendants have tried to rely on such assumptions in proving impact.  Allowing Plaintiffs to do so here would "enlarge" Plaintiffs' rights, and "abridge" Defendants' rights, in violation of the Rules Enabling Act, not to mention contravene due process and Article III.

II.  The district court also erred in failing to ensure that all of Rule 23's requirements were in fact met—before certifying the putative classes at issue.  It is well-settled that a district court may not certify a class unless it has first determined—after a "rigorous analysis"—that *all* of Rule 23's prerequisites have been met.  *Wal-Mart Stores, Inc. v. Duke*s, 564 U.S. 338, 350-51 (2011).  Thus, where the parties dispute whether one of Rule 23's requirements is satisfied and present competing evidence through a "battle of the experts" or otherwise, the district court must resolve that dispute before it certifies a class.

The district court violated that bedrock principle by deferring to a jury the question of which side's experts were right on the extent of uninjured members in each of the classes—and thus whether Plaintiffs had met Rule 23(b)(3)'s predominance requirement—rather than answering that question itself before certification.  Compounding that error, the district court shifted the burden to Defendants to prove that class certification was unwarranted, holding that certification was proper because Defendants had not shown that Plaintiffs' models were "glaringly erroneous."  ER20.  Those fundamental errors violate settled class action law; if adopted, they will upend the administration of class litigation.

The district court's class certification order cannot stand.

**ARGUMENT**

## I. THE DISTRICT COURT ERRED IN CERTIFYING THE CLASSES BASED ON PLAINTIFFS' USE OF REPRESENTATIVE EVIDENCE

The district court's reliance on Plaintiffs' representative evidence about class-wide impact despite the highly individualized circumstances affecting price contravenes Supreme Court precedent, the law in this Court and other circuits, and the plain text of the Rules Enabling Act. It must therefore be reversed.

### A. To Satisfy Rule 23(b)(3)'s Predominance Requirement, Plaintiffs Must Show That They Can Prove Through Common Evidence That All Or Nearly All Class Members Were In Fact Injured

Rule 23 imposes "stringent requirements" for class certification. *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 234 (2013). The most "demanding" is Rule 23(b)(3)'s predominance requirement, which mandates that the party seeking certification must show that "questions affecting only individual members" do not predominate over questions common to the class. *Comcast v. Behrend*, 569 U.S. 27, 33-34 (2013) (quoting Fed. R. Civ. P. 23(b)(3)); *see Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115, 1120 (9th Cir. 2017) (same). That provision is aimed at ensuring that any putative class is "sufficiently cohesive to warrant adjudication by representation." *Walker v. Life Ins. Co. of the Sw*., 953 F.3d 624, 630 (9th Cir. 2020) (citation omitted). The Supreme Court has repeatedly stressed the importance of policing this threshold requirement. *See, e.g.*, *Tyson Foods*, 136 S. Ct. at 1045; *Comcast*, 569 U.S. at 33; *Wal-Mart*, 564 U.S. at 351; *see also Wang*

29

*v. Chinese Daily News, Inc.*, 737 F.3d 538, 545-46 (9th Cir. 2013); *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 946-48 (9th Cir. 2011).

Under the predominance requirement, a district court may grant certification only if it is convinced that the essential elements of the class's claims "can be resolved for all members of the class in a single adjudication." *Walker*, 953 F.3d at 630 (citation omitted). Those "common questions must have the 'capacity . . . to generate common answers apt to drive the resolution of the litigation.'" *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) (alteration in original) (quoting *Wal-Mart*, 564 U.S. at 350), *cert. denied*, 139 S. Ct. 2743 (2019); *see Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127-28 (3d Cir. 2018) ("If proof of the essential elements of the [claim] requires individual treatment, then class certification is unsuitable." (alteration in original) (citation omitted)).

Impact is an essential element of any antitrust claim for damages. 15 U.S.C. § 15. Thus, courts have long held that class certification is improper if an antitrust plaintiff cannot demonstrate that class-wide impact can be proven through common evidence. *See, e.g., Comcast*, 569 U.S. at 30 (to satisfy Rule 23(b)(3), class plaintiffs are required to show "that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that [was] common to the class'" (alteration in original) (citation omitted)); *In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No.*

30

*1869*, 725 F.3d 244, 252 (D.C. Cir. 2013) (similar); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) ("[E]very class member must prove at least some antitrust impact resulting from the alleged violation.").

Antitrust impact does not necessarily follow from a conspiracy. Thus, to establish impact with class-wide proof, Plaintiffs must do more than present "common evidence the defendants colluded to raise [prices]" of packaged tuna; they "must also show that they can prove, through common evidence, that all class members were *in fact injured* by the alleged conspiracy." *Rail Freight*, 725 F.3d at 252 (emphasis added); *see Brown v. American Honda (In re New Motor Vehicles Canadian Exp. Antitrust Litig.)*, 522 F.3d 6, 20 (1st Cir. 2008) ("[C]ommon issues do not predominate if the fact of antitrust violation *and* the fact of antitrust impact cannot be established through common proof." (emphasis added)). If injury cannot be proved through common evidence, then "individual trials are necessary to establish whether a particular [class-member] suffered harm from the [alleged misconduct]," and class treatment under Rule 23 is accordingly inappropriate. *Rail Freight*, 725 F.3d at 252; *see Tyson Foods*, 136 S. Ct. at 1045 (similar).

As courts have recognized, one sure sign that predominance is lacking is that, even when plaintiffs try to identify a common means of establishing class-wide impact, their proof fails to show that all or nearly all of the class is injured. *See, e.g.*, *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits*

*Fund v. Warner Chilcott Ltd. (In re Asacol Antitrust Litig.)*, 907 F.3d 42, 53 (1st Cir. 2018) (where there are class members who "in fact suffered no injury," the "need to identify those individuals will predominate"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (similar).

### B. Averaging Assumptions That Paper Over Individualized Differences Among Class Members Are Inherently Problematic

In an effort to meet the predominance requirement, Plaintiffs submitted expert reports purporting to show class-wide impact through regression models that used various averaging assumptions. As discussed above, all three class experts' models assumed that *all* direct purchasers were overcharged by the same "average" percentages. EPPs' expert doubled down on the improper use of averaging by also assuming that each class member was subject to the same rate of "pass through" as every other end purchaser, irrespective of *where or when* they bought their products. CFPs' expert likewise relied on average "pass through" rates, in effect piling averaging on top of averaging to manufacture common impact.

These assumptions obviously did not reflect reality. Direct purchasers of Defendants' packaged tuna include a vast range of businesses—from Amazon to Tamura's Market in Hau'ula, Hawaii—which differ greatly. Because they negotiate prices individually, such divergent entities would naturally be affected in very different ways by any price-fixing conspiracy. For example, power buyers that never begin negotiations at list price and have massive bargaining power may be able to

protect themselves against wholesale cost increases in a way that small retailers such as Tamura's Market cannot. And any change in the "list price" would, in any event, have no impact on the many direct purchasers that procured their tuna through bespoke bid processes—such as private label buyers. Plaintiffs' models simply assumed away these highly individually differences among buyers by assuming common average overcharges for all direct purchasers.

Indeed, in litigation by the direct purchasers who brought their own suits (the "DAPs"), the claimed overcharges were both significantly below and above the 10.28% "average" overcharge Dr. Mangum *assumed* for every member of the direct-purchaser class—further confirming that his model glossed over substantial price variation that in fact existed among direct purchasers of packaged tuna, as a result of the many different factors affecting pricing discussed above (*supra* 7-9).[12]

The indirect-purchaser classes are even more disparate. The EPP class, for example, contains literally *millions* of everyday consumers who bought billions of packages of tuna for consumption from countless different stores across the country over a four-year period. And the CFP class contains thousands of individuals and

---

[12] *See, e.g.*, ER998 (calculating overcharges of 20.1% from all Defendants for Winn-Dixie); ER1268-69 (calculating overcharges of 8.6% (from Bumble Bee), 11.8% (StarKist), and 22.9% (COSI) for Associated Wholesale Grocers (AWG)); ER1274-75 (calculating overcharges of 8.6% (from Bumble Bee), 15.5% (StarKist), and 24.9% (COSI) for Affiliated Foods Midwest Cooperative (AFMC)).

entities who purchased packaged tuna—for either food preparation or resale—over a five-year period. There is no serious dispute that, in reality, different indirect purchasers were subject to different levels of "pass through" depending on what packaged tuna product they purchased, who they purchased it from, where they purchased it, and when they purchased it. Yet Plaintiffs' models assumed away these individualized differences—which would otherwise be fatal to class certification—through their use of counterfactual averaging assumptions.

As the Supreme Court has observed, the use of averaging risks "manufactur[ing] predominance by assuming away the very differences that make the case inappropriate for classwide resolution." *Tyson Foods*, 136 S. Ct. at 1046. Courts and commentators have likewise expressed concerns about the use of such averaging to show class-wide impact. *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) (the fact that the "shortcut" of averaging was necessary is a cautionary signal against class certification); Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 103 (2009) ("If a cohesive class can be created through such savvy crafting of the evidence, then there would seem to be little limit to class certification in our modern world of increasingly sophisticated aggregate proof."); ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* § 13.B.1.c.2

(2d ed. 2014) ("[A]verages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact.").

That is not to say that representative evidence is *never* permissible as a means of establishing class-wide proof. But the use of such evidence to establish class-wide proof must be carefully policed. And, as the Supreme Court recently explained, representative evidence is not allowed to establish class-wide proof unless it would have "been sufficient to sustain a jury finding . . . if it were introduced in each [plaintiff's] *individual* action." *Tyson Foods*, 136 S. Ct. at 1048 (emphasis added).

That conclusion follows inexorably from the plain text of the Rules Enabling Act and the basic purposes of Rule 23. The Rules Enabling Act provides that rules of procedure, like Rule 23, cannot "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Consistent with this requirement, the Supreme Court has long stressed that class certification is merely a procedural tool "for bringing about aggregation of claims," *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 291 (2008), which "leaves the parties' legal rights and duties intact and the rules of decision unchanged," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality opinion). As a result, "plaintiffs and defendants [cannot have] different rights in a class proceeding than they could have asserted in an individual action." *Tyson Foods*, 136 S. Ct. at 1048.

If a plaintiff were able to prove liability in a class proceeding with evidence that is insufficient to "sustain[] a reasonable jury finding [in her] individual action," then the plaintiff would have "different rights in a class proceeding than [she] could have asserted in an individual action." *Id.* at 1046-47, 1048. In effect, this would permit the class action mechanism to "enlarge" a plaintiff's substantive rights and, thus, violate the Rules Enabling Act. 28 U.S.C. § 2072(b). At the same time, permitting reliance on such representative evidence would "abridge" the rights of the defendant in a class proceeding by eliminating the defendant's ability to present individualized defenses to liability. *Id.*; *see Wal-Mart*, 564 U.S. at 367 ("[A] class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims."). Indeed, extinguishing individual defenses through class litigation would violate the fundamental guarantees of due process. *See Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense." (citation omitted)).

Finally, permitting class members to recover based on representative evidence that could not sustain liability in an individual proceeding also would transgress constitutional limits on the power of the federal courts. Article III limits the authority of federal courts to provide redress only for actual injuries, leaving no authority "to presume and remediate harm that has not been established." *Lewis v. Casey*, 518 U.S. 343, 357-58 & 360 n.7 (1996); *see Ramirez v. TransUnion LLC*,

36

951 F.3d 1008, 1023-24 (9th Cir. 2020). Thus, "if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand." *Tyson Foods*, 136 S. Ct. at 1053 (Roberts, C.J., concurring). Here, the use of averaging not only obscured individual differences among class members, but also swept in class members who have not been injured at all.

### C. Far From Sanctioning The Use Of Representative Evidence, *Tyson Foods* Underscores The Limits On When It Is Allowed

*Tyson Foods* illustrates when representative proof can—and cannot—be used to satisfy the predominance requirement. There, a class of employees at a poultry processing plant brought suit under the Fair Labor Standards Act (FLSA) for uncompensated time spent "donning and doffing" protective work gear. *Id.* at 1043. In order to establish liability for lack of overtime payments, each employee had to prove that he or she had worked over 40 hours in a given week. *Id.* But because the employer had breached its statutory obligation to keep records of donning-and-doffing time, it was impossible for plaintiffs to construct the actual time they had spent donning and doffing their gear. So, in the absence of such records, the plaintiffs relied on a representative study that assumed that each employee spent an equal amount of time donning and doffing. The Court allowed the use of that representative evidence, but only after explaining that, under longstanding precedent, the same study could "sustain" liability if it had been "introduced in each [class-member]'s *individual* action." *Id.* at 1048 (emphasis added).

The Court first explained that, under the seminal wage-and-hour decision of *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), FLSA claims are subject to a special evidentiary rule: "[W]hen employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the 'remedial nature of [the FLSA] and the great public policy which it embodies'" permit an employee (even in an individual action) to rely on a "representative sample to fill [that] evidentiary gap." *Tyson Foods*, 136 S. Ct. at 1047 (alteration in original) (quoting *Mt. Clemens*, 328 U.S. at 687). Under *Mt. Clemens*, "[i]f the employees [in *Tyson Foods*] had proceeded with 3,344 individual lawsuits, each employee likely would have had to introduce [the same] study to prove the hours he or she worked." *Id.* Accordingly, the Court concluded that this study was a permissible means of establishing injury in the class context, too. *Id.*

Importantly, however, the Court in *Tyson Foods* expressly distinguished *Wal-Mart*, where the Court refused to allow the use of representative evidence as a means of class-wide proof. *Id.* at 1048. The plaintiffs in *Wal-Mart*, who alleged employment discrimination by different stores across the country, had proposed using a sampling methodology whereby "[a] sample set of the class members would be selected" and "[t]he percentage of claims determined to be valid would then be applied to the entire remaining class" to determine liability and the entire class

38

recovery. 564 U.S. at 367. The Court expressly rejected that approach, decrying it as a method of "Trial by Formula" that would violate the Rules Enabling Act. *Id*.

The Court in *Tyson Foods* explained that "[t]he underlying question in *Wal–Mart*, as [in *Tyson Foods*], was whether the sample at issue could have been used to establish liability in an *individual* action." 136 S. Ct. at 1048 (emphasis added). But in *Wal-Mart*, because "the employees were not similarly situated," if they "had brought 1½ million individual suits, there would be little or no role for representative evidence." *Id.* Indeed, as the Court explained, none of the plaintiffs in *Wal-Mart* "could have prevailed in an individual suit" by relying on evidence about how *other* employees were discriminated against. *Id.* "Permitting the use" of such representative evidence to establish that Rule 23's requirements for class certification were met, therefore, "*would* have violated the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Id.* (emphasis added).

Plaintiffs in this case have previously argued that this Court rejected this interpretation of *Tyson Foods* in *Senne v. Kansas City Royals Baseball Corp.* (*Senne III*), 934 F.3d 918 (9th Cir. 2019). Joint Opp'n to Rule 23(f) Pet. 2, 9, 16 (9th Cir. Aug. 23, 2019) (No. 19-80108), ECF No. 6. But, in fact, *Senne III* only confirms the principles discussed above. *Senne III* involved a wage-and-hour class action like *Tyson Foods*. And like *Tyson Foods*, this Court held that the district court had

properly relied on representative evidence in finding that the predominance requirement was met. 934 F.3d at 941-42. But as this Court explained in *Senne III*, that conclusion followed naturally from *Tyson Foods*. Under the *Mt. Clemens* rule applied in *Tyson Foods,* the "use of representative evidence at the trial stage to show damages" has long been allowed in *individual* wage-and-hour actions. *Id.* at 939. Thus, because the *Senne III* plaintiffs would have been permitted to rely on such evidence in an individual action, the evidence was "a permissible means of establishing the employees' hours worked in a class action." *Id.* at 940 (quoting *Tyson Foods*, 136 S. Ct. at 1046-47). At the same time, however, in distinguishing *Wal-Mart*, this Court observed that "*Tyson* [*Foods*] expressly cautioned that this rule should be read narrowly and not assumed to apply outside of the wage and hour context." *Id.* at 947 n.27.

Other circuits have likewise restricted the use of representative evidence to meet Rule 23(b)(3)'s predominance requirement. In *In re Asacol Antitrust Litigation*, for example, the First Circuit rejected the use of representative evidence in an antitrust action alleging that certain drug manufacturers had conspired to pull a generic drug from the market because the evidence would have been insufficient to establish antitrust impact in an individual action. 907 F.3d at 54. There, the plaintiffs attempted to prove antitrust impact through a statistical model that purported to show that 90% of the class would have opted for a generic alternative

to the defendant's drug if not for the defendant's alleged market manipulation. *Id.* In rejecting the use of such representative evidence, the First Circuit explained that, unlike in *Tyson Foods*, "plaintiffs point to no . . . substantive law that would make an opinion that ninety percent of class members were injured both admissible and sufficient to prove that any given individual class member was injured." *Id.* The Third Circuit has similarly rejected the use of representative evidence to meet Rule 23 where that evidence would have been insufficient to establish injury in an individual action. *See Reinig*, 912 F.3d at 129-30 (relying on *Tyson Foods*, 136 S. Ct. at 1046-47).

If representative evidence could not "have been used to establish liability in an individual action," *Tyson Foods*, 136 S. Ct. at 1048, then it cannot be used to establish an element of liability in a class proceeding.

**D. The District Court Plainly Erred In Allowing Plaintiffs To Rely On Averaging Assumptions To Establish Class-Wide Antitrust Impact**

Plaintiffs' reliance on averaging assumptions to establish class-wide impact, and thus satisfy the predominance requirement, was improper. If each class member had brought its own antitrust action against Defendants for the same alleged price-fixing conspiracy (as many have, *see supra* 15 n.5, 33), it is unquestionable that none of them could have "sustain[ed] a jury finding" by relying on Plaintiffs' experts' counterfactual assumptions that each direct purchaser was, in fact, overcharged *equally*, and that each end purchaser was subject to pass-through at an *identical* level.

41

*See Tyson Foods*, 136 S. Ct. at 1048. Yet, the district court allowed the class Plaintiffs to rely on those averaging assumptions to show that Rule 23(b)(3)'s predominance requirement was met. That was error.

Unlike in *Tyson Foods*, in this case there is no substantive law that would allow the use of representative evidence to establish the underlying element at issue—impact—in an individual action. This case, of course, is not a wage-and-hour dispute implicating the *Mt. Clemens* rule, *cf. Senne III*, 934 F.3d at 947 n.27, and here, as in *Asacol*, "plaintiffs point to no substantive law" that allows them to rely on representative evidence to establish antitrust impact, 907 F.3d at 54. In addition, unlike the workers at a single factory in *Tyson Foods* (who "worked in the same facility, did similar work, and w[ere] paid under the same policy," 136 S. Ct. at 1048), the direct purchasers here span a wide range of entities from across the country of different sizes and with different pricing models and retail strategies.[13]

Indeed, the singular feature that defines the classes here is just how *varied* the individual class members are when it comes to factors affecting prices. Prices for Defendants' packaged tuna products were set through individualized negotiations, and reflected not only differences in bargaining power but also differences in price

---

[13] Moreover, unlike the situation in *Tyson Foods,* in which the records were unavailable because the defendant had violated its statutory obligation to keep proper records, here Defendants provided Plaintiffs with extensive sales data.

elasticity, procurement strategy, negotiation priorities, and product preference. As courts have recognized, individualized negotiation of this kind is fundamentally incompatible with common proof of impact. *See, e.g.*, *New Motor Vehicles*, 522 F.3d at 29 (holding that common evidence cannot prove class-wide injury where "[t]oo many factors play into an individual negotiation" to assume a uniform "effect on the final price paid"); *Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005) (rejecting averaging assumptions where "the market for seeds is highly individualized"); *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 423 (5th Cir. 2004) (rejecting evidence that "defie[d] the realities of the haggling").

Plaintiffs must have appreciated this fundamental flaw in their remarkably broad class design, which is presumably why they resorted to averaging assumptions in their regression models in an effort to show class-wide impact. Those averaging assumptions glossed over the highly individualized price negotiations between Defendants and direct purchasers and other factors discussed above that made the claims unsuitable for class-wide adjudication, effectively *generating* the common price impact that the experts were purporting to prove. As soon as that assumption is removed, as Plaintiffs' experts *admit*, their models no longer find overcharges for all relevant direct purchasers. *See supra* 18-21.[14]

---

[14] That Dr. Mangum's model somehow yields an "uninjured" number of 5.5% despite assuming injury as to all class members only confirms the model's flaws. That 5.5% figure results from the fact that certain direct purchasers paid prices so

Significantly, all this is confirmed by the actions brought by the more than 100 direct purchasers who are pursuing their antitrust claims individually. *None* of those entities has relied on Dr. Mangum's model, or anything like it, in attempting to show that they were in fact injured by the alleged price-fixing conspiracy. Instead, they claim individualized overcharge rates that vary significantly from each other and from Dr. Mangum's assumed average overcharge. And in those cases, Defendants have been able to introduce individualized defenses rebutting the notion that certain purchasers were overcharged at all—based on case-specific factors.[15] That confirms that this case is very unlike *Tyson Foods*. Indeed, the individual actions that are currently proceeding against Defendants in fact test whether Plaintiffs' experts' averaging assumptions really could sustain liability in an individual action—an experiment Plaintiffs' theory of proof utterly fails.

Class treatment is even more inappropriate for the indirect purchasers. It is inconceivable that members of the EPP and CFP classes could rely on Plaintiffs' experts' studies in *individual* trials. The EPP class, for example, includes many

---

low that, even after subtracting the assumed overcharge from his predicted price for that purchaser, the resulting number was *still* higher than the price actually paid. Those dramatically lower-than-predicted prices should have been a red flag for Dr. Mangum (and the district court) that there were significant individualized differences between class members that precluded certification here.

[15] *See, e.g.*, ER1238-55, 1257-58 (testimony from economist finding 0% overcharges for AWG, AFMC, and Winn-Dixie).

millions of consumers in 30 States, D.C., and Guam that together purchased billions of packages of tuna over a four-year period. EPP Cert. Mot. 1, 8 (Dkt. No. 1129). It is entirely unrealistic to think that a person who bought packaged tuna from the retailer Target would be able to rely in an individual suit on a study that assumed she had instead bought from a generic direct purchaser that had suffered an *average* overcharge and passed through the *average* percentage of this overcharge to consumers. Quite rightly, a court would demand that the individual plaintiff rely on Target-specific data, and permit Defendants to introduce specific evidence showing that Target did *not*, in fact, suffer any overcharge or did *not*, in fact, pass any such overcharge through to its customers. To permit class plaintiffs to avoid that burden by using averaging assumptions would plainly "enlarge" their rights and "abridge" Defendants' rights. The Rules Enabling Act forbids that result.

The district court here seemed to reason that Plaintiffs' averaging assumptions were permissible to establish class-wide impact as long as they met some minimum indicia of reliability. *See* ER24 ("Defendants have not persuaded the Court that Dr. Mangum's model is unreliable or incapable of proving impact on a class-wide basis."). That was error. Defendants below challenged whether it was permissible to assume that each class member was equally affected. *See, e.g.*, Defs.' DPP Opp'n 12 (Dkt. No. 1514) ("A methodology that assigns a single, common overcharge to all class members *assumes* rather than *proves* common impact and, thus, does not

45

satisfy Rule 23(b)(3).”); Defs.’ EPP Opp’n 23 (Dkt. No. 1411) (“Dr. Sunding’s use of averages conceals substantial variation . . . leaving EPPs unable to show impact on a class-wide basis.”); Defs.’ CFP Opp’n 2 (Dkt. No. 1409) (“Dr. Williams’ reliance on average overcharges guarantees common impact by smoothing over key differences among class members.”).  The pertinent question here, therefore, was not whether Plaintiffs’ models were reliable, or not, in the abstract.  Rather, it was whether—even assuming the models met some minimum threshold of reliability— the averaging assumption is *allowed at all* to establish class-wide impact.  Plaintiffs must proffer evidence that is both reliable *and* comports with Rule 23.[16]

A study may well be “capable” of showing class-wide impact as a technical matter, but nonetheless may be an *impermissible* way of doing so.  In *Wal-Mart*, for example, the proposed sampling methodology was assuredly “capable” of showing class-wide injury as a theoretical matter—and may well have been persuasive to a jury—but it was not a permissible way of establishing predominance because it would not have been allowed to establish liability in an individual action.  *Tyson*

---

[16]  Regression models are, of course, sometimes used in antitrust and other litigation in various ways, including to supplement other evidence.  *See Econometrics*, *supra*, § 13.B.1.c.  But careful judicial scrutiny of their use in class proceedings is important.  “[R]egression analysis will always yield a result” but “[w]hether a regression is useful for assessing classwide impact is a different question.”  *Id.*  Where, as here, a regression analysis is based on unjustified averaging assumptions, which mask important differences amongst class members and which would not be admissible to prove impact in an individual action, that analysis cannot satisfy Rule 23 and the limits recognized by *Tyson Foods*.

46

*Foods*, 136 S. Ct. at 1048. Rather, the use of such proof constituted an improper "Trial by Formula." *Id.* (quoting *Wal-Mart*, 564 U.S. at 367). Likewise, in *Tyson Foods*, the Supreme Court did not focus its inquiry on whether the representative sample on which the plaintiffs relied was "reliable" in some evidentiary sense, but rather on whether that sample could have been used as a matter of substantive law to establish liability in an individual action. *Id.* at 1046-47.

In focusing on whether the representative evidence at issue was reliable or capable of showing class-wide impact, the district court missed the critical inquiry: Whether such evidence, even assuming it is otherwise admissible, was a permissible means of establishing class-wide injury to begin with. The answer to that question is clear: The use of averaging manufactured the very class-wide impact the models purported to prove, and the nature of the class and underlying substantive law was such that the same study could *not* have sustained liability in each class member's individual action. Because such evidence would not establish impact in an individual action, it is not allowed to establish class-wide impact for purposes of clearing Rule 23's demanding predominance requirement.

Accordingly, the district court erred in certifying the putative classes based on the use of such representative evidence to establish predominance. That error, alone, requires reversal of the district court's class certification order.

## II.   THE DISTRICT COURT ERRED IN CERTIFYING THE CLASSES WITHOUT MAKING A KEY PREDOMINANCE DETERMINATION

The district court separately erred in certifying the putative classes without first resolving a factual dispute central to whether Plaintiffs had shown that Rule 23(b)(3)'s predominance requirement was met to begin with.[17]

### A.   A District Court Must Determine Whether All Of Rule 23's Requirements Are Met Before Certifying Any Class

It is well-settled that the party seeking class certification under Rule 23 "must affirmatively demonstrate his compliance with the Rule." *Wal-Mart*, 564 U.S. at 350.   And the district court must "conduct a 'rigorous analysis'" to determine whether this exacting burden has been met before it certifies a class. *Comcast*, 569 U.S. at 35 (quoting *Wal-Mart*, 564 U.S. at 350-51); *see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (same).   This means that when it comes to Rule 23(b)(3) cases like this one, district courts must "take a '*close look*' at whether common questions predominate over individual ones." *Comcast*, 569 U.S. at 34 (citation omitted) (emphasis added); *see Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("The district court abused its discretion by not adequately considering the predominance requirement *before certifying the class*." (emphasis added)).   Oftentimes, the Supreme Court has stressed, that "rigorous

---

[17]   In analyzing this question, the district court focused on the DPP class, and then carried that analysis through to the EPP and CFP classes. ER15-19, 35, 51. We likewise focus primarily on the DPP class, but the same errors carry through.

analysis" and "close look," *Comcast*, 569 U.S. at 34-35 (citations omitted), will "entail some overlap with the merits of the plaintiff's underlying claim" or the rigors of any models presented, *Wal-Mart*, 564 U.S. at 351-52.

In *Comcast*, for example, the Supreme Court held that a district court erred in certifying an antitrust class without engaging in a "rigorous analysis" of the plaintiffs' expert's model for showing class-wide impact and, thus, predominance. 569 U.S. at 35-37 (citation omitted). As the Court explained, there were serious questions as to whether the plaintiffs' model in fact identified class members who were injured by the alleged anticompetitive conduct as opposed to permissible factors. *Id.* at 38. Yet, the district court had failed to examine the model's flaws because it believed that was a "merits" question for trial. *Id.* at 35-36. The Supreme Court held that that was error, explaining that the district court's hands-off approach "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

When faced with a "battle of the experts" over an issue central to class certification—here, predominance—Rule 23 demands that the district court "judg[e] the persuasiveness of the evidence presented" and resolve the experts' dispute *before* certifying the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see also Wal-Mart*, 564 U.S. at 363 ("[Rule 23](b)(3) requires the judge to make findings about predominance and superiority *before* allowing the class." (emphasis added)); Nagareda, 84 N.Y.U. L. Rev. at 114 ("The existence of a genuine

dispute over whether a certification requirement has been met will not suffice to certify a class, even when cast in terms of divergent expert submissions from the two sides regarding issues that overlap with a merits dispute. Rather, the court must resolve the dispute . . . ." (footnote omitted)).

Accordingly, a district court faced with competing expert accounts of the extent of uninjured members in a putative class must resolve that dispute before certifying any class, even if doing so is difficult or complex, involves a close call, or will "entail some overlap with the merits of the plaintiff's underlying claim" or the rigors of any models presented, *Wal-Mart*, 564 U.S. at 351-52. If, after undertaking such a rigorous assessment, the court is unable to determine which expert is correct, it must *deny* certification because (1) the "party seeking class certification" bears the burden to "affirmatively demonstrate his compliance with [Rule 23]," *id*. at 350; and (2) that party's failure to establish a critical Rule 23 requirement bars certification.

The district court lost sight of these touchstone principles here.

## B. The District Court Erred In Certifying The Classes Without First Resolving The "Battle Of The Experts" Over Class-Wide Impact

As explained, the parties vigorously disputed whether Plaintiffs could show through a common method that the wide-ranging members of the putative classes were impacted by the alleged conspiracy, and, relatedly, whether Plaintiffs could use various averaging assumptions to show that class members were affected by the alleged price-fixing conspiracy. But the parties vigorously disagreed over a related

50

issue as well. Even assuming it was proper for Plaintiffs to rely on representative evidence as a general matter to show class-wide impact, *but see supra* Part I, the parties disputed the extent to which that evidence actually proved class-wide impact—and the extent to which class members were actually injured.

According to Dr. Mangum himself, his proposed model showed no injury to 5.5% of class members. ER2019. But according to Defendants' expert (Dr. Johnson), that model was based on a flawed methodological choice. When the requirement of a single average overcharge was eliminated and the overcharge was allowed to vary by direct purchaser, as Dr. Johnson explained, Dr. Mangum's model could not prove impact to at least 28% of class members. ER1479-81; ER718-21.[18] Even the district court recognized that a "model unable to show impact to over 28% of the class members would unquestionably [fail to establish predominance]." ER16. Resolving this dispute in Defendants' favor therefore would preclude certification.[19]

Moreover, Defendants' experts identified another significant flaw in Dr. Mangum's model: It generated "false positives"—*i.e.*, it registered overcharges where none, in fact, should be present. ER19-20. For example, the model registered

---

[18] Dr. Sunding's model was likewise incapable of establishing an overcharge, and thus impact to EPPs, for 27.1%, 35.5%, and 31.1% of direct purchasers from StarKist, Bumble Bee, and COSI, respectively. ER1618.

[19] In Defendants' view, even 5.5% uninjured class members would be too much to satisfy Rule 23's stringent requirements. But the salient point here is that even the district court recognized that 28% is too much.

overcharges on purchases from non-Defendants and from purchases made during periods Plaintiffs' experts used as competitive benchmarks. ER1478-79 & n.65. As the D.C. Circuit has explained, the fact that a model generates false positives alone establishes that it likely has methodological flaws, and alone "shred[s] the plaintiffs' case for certification." *Rail Freight*, 725 F.3d at 252-53.

Yet, rather than resolve this battle of the experts regarding whether Plaintiffs' models concealed too large a number of uninjured class members—a question central to the predominance inquiry—the district court simply punted that critical inquiry to the jury and certified the putative classes. The district court reasoned that it was not its role "to determine which multiple regression model is most accurate" in assessing class certification on the ground that this was "ultimately a merits decision" for a jury. ER24 (citation omitted). That holding is fundamentally wrong.

Determining whether Rule 23's requirements are met is always a task for a Court. And, thus, determining whether an expert's opinion is persuasive in showing a Rule 23 requirement is satisfied "is always a task for the court—no matter whether a dispute might appear to implicate the 'credibility' of one or more experts, a matter resembling those usually reserved for a trier of fact." *Hydrogen Peroxide*, 552 F.3d at 324; *see Comcast*, 569 U.S. at 36 n.5. Deferring a determination on class-wide impact effectively "amounts to a delegation of judicial power to the plaintiffs, who [could then] obtain class certification just by hiring a competent expert." *West v.*

*Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002); *see Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233-34 (11th Cir. 2016) ("A district court that has doubts about whether the 'requirements of Rule 23 have been met should refuse certification until they have been met.'" (citation omitted)).

Nor does requiring a district court to make this Rule 23 determination usurp the jury's role. The jury has no role in deciding whether a class *should be certified—* and, more specifically, whether Rule 23(b)(3)'s predominance requirement is met. *See Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) ("The Rule 23(b)(3) predominance inquiry asks *the court* to make a global determination of whether common questions prevail over individualized ones." (emphasis added)). That determination is for a court, and only a court. Even if disputed evidence also might be relevant to a jury's determination on the merits, that in no way excuses a district court's obligation to determine that all of the Rule 23's requirements for class certification are met *before* certifying that class to begin with.

This Court recognized this very requirement in *Ellis v. Costco Wholesale Corp*. In *Ellis*, an employment discrimination case, the parties presented competing expert reports on Rule 23's commonality requirement. 657 F.3d at 982, 984. Instead of deciding which expert was correct, the district court found the commonality requirement satisfied based merely on the fact that the plaintiffs' expert reports were *admissible*. *Id.* at 982. This Court vacated class certification, holding that the district

court erred in "fail[ing] to resolve the critical factual disputes" surrounding the parties' "battle of the experts." *Id.* at 982, 984. As the Court explained, the district court had "failed to engage in a 'rigorous analysis'" and to "resolve any factual disputes necessary to determine whether" Rule 23's requirements had in fact been met. *Id.* at 983-84. The same conclusion follows here.

The case law in other circuits is to the same effect. In *Rail Freight*, for example, the D.C. Circuit held that it is "indisputably the role of the district court to scrutinize the evidence [including statistical models relied on by plaintiffs] *before granting certification*, even when doing so 'requires inquiry into the merits of the claim.'" 725 F.3d at 253 (emphasis added) (quoting *Comcast*, 569 U.S. at 35); *see id.* at 255 ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it."). Applying that rule, the D.C. Circuit vacated a class certification order and remanded. On remand, the district court denied class certification, after resolving the battle of the experts. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 90-91, 145 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).

Likewise, in *In re Lamictal Direct Purchaser Antitrust Litigation*, the Third Circuit recently explained that the "'rigorous analysis'" required under Rule 23 entails "three key aspects": (1) "the court must 'find[]' that the requirements of Rule 23 are met"; (2) "'the court must resolve all factual or legal disputes relevant to class

certification,'" including as to experts; and (3) "the court must consider 'all relevant evidence and arguments,' including 'expert testimony.'" 957 F.3d 184, 2020 WL 1933260, at *4 (3d Cir. 2020) (citations omitted). Finding that the district court had failed to engage in such a rigorous analysis, the Third Circuit vacated the class certification order and remanded to the district court. *Id.* at *7.[20]

The district court in this case compounded its error in refusing to resolve the "battle of the experts" over the extent of uninjured class members by effectively shifting the burden of proof to Defendants to affirmatively *disprove* the claims of Plaintiffs' experts. ER19-20, 37. The district court reasoned that class certification was proper because "*Defendants* [did] not persuade[] the Court that [Plaintiffs'] model is unreliable." ER24 (emphasis added). That, too, is error. As both this Court and the Supreme Court have stated time and again, it is the "party seeking class certification" who "has the burden of affirmatively demonstrating that the class meets the requirements of Federal Rule of Civil Procedure 23." *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012); *see also Wal-Mart*, 564 U.S.

---

[20] *See also, e.g.*, *Blades*, 400 F.3d at 575 ("[A] court may be required to resolve . . . expert disputes concerning the import of evidence concerning the factual setting . . . ."); *West*, 282 F.3d at 938 ("Tough questions must be faced and squarely decided, if necessary by . . . choosing between competing perspectives."); *accord In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 567 (N.D. Cal. 2013); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. CIV.A. 04-5898, 2010 WL 3855552, at *6 (E.D. Pa. Sept. 30, 2010).

at 350-51 (same); *Comcast*, 569 U.S. at 33 (same); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018) (same), *cert. denied*, 139 S. Ct. 1651 (2019); *Ellis*, 657 F.3d at 979-80 (same). The district court flipped this burden on its head.

If that were not enough, the district court exacerbated its burden-shifting error by ratcheting *up* the burden supposedly carried by Defendants. The district court ultimately determined that the predominance requirement was met because Defendants had not shown that Plaintiffs' models were "glaringly erroneous." ER20; *see* ER58-59. The district court's "glaringly erroneous" test is nowhere to be found in the text of Rule 23 itself, nor does the district court provide any citation to any case that may have originated this standard. *See, e.g.*, *Lamictal*, 2020 WL 1933260, at *5 ("[P]laintiffs must prove their claim is capable of common proof by a preponderance of the evidence . . . ."); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (same). Indeed, the district court's "glaringly erroneous" test harkens back to now-repudiated case law holding that class-wide proof is acceptable so long as it is "not fatally flawed." *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280 F.3d 124, 135 (2d Cir. 2001).

It was not Defendants' burden to prove that Plaintiffs' models were "glaringly erroneous" to *avoid* certification; it was Plaintiffs' burden to prove that Plaintiffs'

models in fact established class-wide injury to *obtain* class certification. And, for the reasons already explained, Plaintiffs fell far short of satisfying that burden.

## C. Adopting The District Court's "Certify Now, Decide Later" Approach Would Have Far Reaching And Harmful Effects

The district court's "certify now, decide later" approach is not only wrong under Supreme Court and Ninth Circuit precedent, it also undermines the institutional role of the courts and "reduce[s] Rule 23(b)(3)'s predominance requirement to a nullity," *Comcast,* 569 U.S. at 34-36.

Kicking threshold class certification questions down the road to a jury unnecessarily prolongs class litigation, taxing all involved. As explained, the district court must be satisfied that Plaintiffs can show injury on a class-wide basis *before* certifying any class. But if a district court does not require that showing at the class certification stage, unsound classes could proceed for years longer, before eventually being decertified when it becomes clear at trial that such proof does not exist. Both parties and courts would have to invest enormous resources in preparing for class trials even in situations where, in fact, the requirements of Rule 23 cannot be met.

The risk of unnecessarily prolonging cases is especially great, because the heightened burden the district court placed on defendants' shoulders is so skewed in plaintiffs' favor that it will be difficult for a defendant to satisfy in any case—and virtually irrebuttable in cases involving complex statistical or technical proof. In the typical "battle of the experts," each party presents the thoroughly researched models

of learned experts with years of experience. Such battles are often difficult to resolve precisely because neither expert-developed model is likely to be "glaringly erroneous." ER20. If "certification is automatic every time counsel dazzle the courtroom with graphs and tables," then "nearly all antitrust plaintiffs could survive certification without fully complying with Rule 23." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491-92 (N.D. Cal. 2008) (citations omitted).

Moreover, once a class is certified, it is unlikely that the persuasiveness of the expert's model will *ever* be tested before a jury in the way the district court envisioned. As the Supreme Court has explained, "[c]ertification of a large class may so increase the defendant's potential damages liability and litigation cost[]" that even the most surefooted defendant "may find it economically prudent to settle and to abandon a meritorious defense." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978); *accord AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) ("Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims."). That is why virtually all certified class actions that are not dismissed ultimately end in settlement. *See* Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649, 1650 (2008) ("Settlements dominate the landscape of class actions.").

That pressure to settle is especially problematic where, as here, the plaintiffs' own expert acknowledges that his modeling does not establish injury for all class

58

members. In such situations, the "certify now, decide later" approach will inescapably lead to class-wide recovery for classes that do not in fact meet Rule 23's predicates, and for individuals over whom the court may even lack jurisdiction. *See Tyson Foods*, 136 S. Ct. at 1053 (Roberts, C.J., concurring). Because of the overwhelming pressure to settle, class certification is often a defendant's only meaningful opportunity to test the plaintiffs' assertion that the members of the putative class have suffered actual injury. The district court's approach therefore raises the troubling prospect of cases beyond the scope of Article III being adjudicated in the federal courts and uninjured class members being awarded monetary relief the federal courts have no authority to order.

Accordingly, even if Plaintiffs' use of representative evidence somehow could be excused here, the district court's certification order still cannot stand.

## CONCLUSION

For the foregoing reasons, the district court's class certification order should be reversed, and this case should be remanded for further proceedings.

Dated:  May 14, 2020

Respectfully submitted,

*s/ Gregory G. Garre*

John Roberti
ALLEN & OVERY LLP
1101 New York Avenue, NW
Washington, DC 20005
(202) 683-3800

Gregory G. Garre*
Samir Deger-Sen
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

*Counsel for Defendants-Appellants Tri-Union Seafoods LLC d/b/a Chicken of the Sea International and Thai Union Group PCL*

*\* I certify that all parties listed concur with the filing of this brief.*

Christopher S. Yates
Belinda S Lee
Ashley M. Bauer
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Defendants-Appellants StarKist Co. and Dongwon Industries Co., Ltd.*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants-Appellants state that they are unaware of any cases pending in this Court that are related to this appeal, as in defined Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(5)-(7), and Ninth Circuit Rule 32-1, Defendants-Appellants' Opening Brief is proportionately spaced, has a typeface of 14 point and contains 13,904 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

 s/ *Gregory G. Garre*
Gregory G. Garre

**ADDENDUM**

**Pursuant to 9th Cir. R. 28-2.7**

## TABLE OF CONTENTS

**Description**                                                      **Page**

U.S. Const. art. III, § 2 .................................................................. Add-1

U.S. Const. amend. V...................................................................... Add-2

15 U.S.C. § 15................................................................................ Add-3

28 U.S.C. § 2072............................................................................ Add-5

Federal Rule of Civil Procedure 23 .............................................. Add-6

## U.S. Const. art. III, § 2

The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

**U.S. Const. amend. V**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

# 15 U.S.C. § 15

## § 15.  Suits by persons injured

### (a)  Amount of recovery; prejudgment interest

Except as provided in subsection (b), any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.  The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.  In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

(3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

### (b)  Amount of damages payable to foreign states and instrumentalities of foreign states

(1)  Except as provided in paragraph (2), any person who is a foreign state may not recover under subsection (a) an amount in excess of the actual damages sustained by it and the cost of suit, including a reasonable attorney's fee.

(2) Paragraph (1) shall not apply to a foreign state if—

(A) such foreign state would be denied, under section 1605(a)(2) of Title 28, immunity in a case in which the action is based upon a commercial activity, or an act, that is the subject matter of its claim under this section;

(B) such foreign state waives all defenses based upon or arising out of its status as a foreign state, to any claims brought against it in the same action;

(C) such foreign state engages primarily in commercial activities; and

(D) such foreign state does not function, with respect to the commercial activity, or the act, that is the subject matter of its claim under this section as a procurement entity for itself or for another foreign state.

## (c) Definitions

For purposes of this section—

(1) the term "commercial activity" shall have the meaning given it in section 1603(d) of Title 28, and

(2) the term "foreign state" shall have the meaning given it in section 1603(a) of Title 28.

## 28 U.S.C. § 2072

**§ 2072.  Rules of procedure and evidence; power to prescribe**

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

(b) Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

(c) Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title.

## Federal Rule of Civil Procedure 23

**Rule 23. Class Actions**

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)  the likely difficulties in managing a class action.

**(c)  Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

 (1)  Certification Order.

  (A)  Time to Issue.  At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

  (B)  Defining the Class; Appointing Class Counsel.  An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

  (C)  Altering or Amending the Order.  An order that grants or denies class certification may be altered or amended before final judgment.

 (2)  Notice.

  (A)  For (b)(1) or (b)(2) Classes.  For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

  (B)  For (b)(3) Classes.  For any class certified under Rule 23(b)(3)—or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.  The notice must clearly and concisely state in plain, easily understood language:

   (i)  the nature of the action;

   (ii)  the definition of the class certified;

   (iii)  the class claims, issues, or defenses;

   (iv)  that a class member may enter an appearance through an attorney if the member so desires;

   (v)  that the court will exclude from the class any member who requests exclusion;

   (vi)  the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

(3) Judgment. Whether or not favorable to the class, the judgment in a class action must:

(A) for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

(B) for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) Particular Issues. When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) Subclasses. When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

(1) In General. In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action— giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) Combining and Amending Orders. An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) Notice to the Class.

(A) Information That Parties Must Provide to the Court. The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B) Grounds for a Decision to Give Notice. The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2) Approval of the Proposal. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3) Identifying Agreements. The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) New Opportunity to be Excluded. If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement

unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Class-Member Objections.

(A) In General. Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B) Court Approval Required for Payment in Connection with an Objection. Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

(i) forgoing or withdrawing an objection, or

(ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) Procedure for Approval After an Appeal. If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered, or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

(1) Appointing Class Counsel. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)  counsel's knowledge of the applicable law; and

(iv)  the resources that counsel will commit to representing the class;

(B)  may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C)  may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D)  may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E)  may make further orders in connection with the appointment.

(2) Standard for Appointing Class Counsel.  When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4).  If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) Interim Counsel.  The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) Duty of Class Counsel.  Class counsel must fairly and adequately represent the interests of the class.

**(h)  Attorney's Fees and Nontaxable Costs.**  In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.  The following procedures apply:

(1)  A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2)  A class member, or a party from whom payment is sought, may object to the motion.

(3)  The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4)  The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).