No. 19-56514

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

## OLEAN WHOLESALE GROCERY COOPERATIVE, INC., *et al.*
*Plaintiffs-Appellees*

v.

## BUMBLE BEE FOODS LLC, *et al.*
*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the Southern District of
California, Case No. 3:15-md-02670-JLS-MDD

---

## PLAINTIFFS-APPELLEES' JOINT ANSWERING BRIEF
## - UNDER SEAL -

---

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Samantha J. Stein
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

*Counsel for Plaintiffs-Appellees Direct Purchaser Plaintiff Class*

(Additional Counsel Listed on Inside Cover)

Betsy C. Manifold
Rachele R. Byrd
Marisa C. Livesay
Brittany N. Dejong
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101
Tel:  619/239-4599


Thomas H. Burt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel: 212/545-4600


*Lead Counsel for Plaintiffs-Appellees*
*End Payer Plaintiff Class*

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
CUNEO GILBERT &
  LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Tel: 202.789.3960

*Counsel for Plaintiffs-Appellees*
*Commercial Food Preparer Plaintiff*
*Class*

# CORPORATE DISCLOSURE STATEMENTS

## DIRECT PURCHASER PLAINTIFFS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellees for the Direct Purchaser Plaintiff Class, Olean Wholesale Grocery Cooperative, Inc.; Piggly Wiggly Alabama Distributing Co., Inc.; Trepco Imports and Distribution Ltd.; Benjamin Foods LLC; Pacific Groservice Inc. d/b/a PITCO Foods; and Plaintiff Howard Samuels as Trustee in Bankruptcy for Central Grocers, Inc., by and through the undersigned counsel, hereby certify that no publicly-held corporations own 10% or more of their outstanding stock.

*s/ Michael P. Lehmann*
Michael P. Lehmann
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

*Lead Counsel for Plaintiffs-Appellees*
*Direct Purchaser Plaintiff Class*

i

# CORPORATE DISCLOSURE STATEMENTS

## COMMERCIAL FOOD PREPARER PLAINTIFFS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellees for the Commercial Food Preparer Plaintiff Class, Thyme Café & Market Inc., Simon-Hindi LLC d/b/a Simon's, Capitol Hill Supermarket Inc., Confetti's, Maquoketa Care Center, Inc., A-1 Diner Inc., Francis T. Enterprises d/b/a Erbert & Gerbert's, Groucho's Deli of Raleigh LLC, Sandee's Catering, Groucho's Deli of Five Points LLC, Rushin Gold LLC d/b/a The Gold Rush, and Erbert & Gerbert's Inc. hereby certify that no publicly-held corporations own 10% or more of their outstanding stock.

*s/ Jonathan W. Cuneo*
Jonathan W. Cuneo
CUNEO GILBERT &
 LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Tel: 202.789.3960

*Counsel for Plaintiffs-Appellees*
*Commercial Food Preparer Plaintiff*
*Class*

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ............................................. i

INTRODUCTION ........................................................................... 1

    ISSUE TO BE DECIDED ........................................................ 3

    COUNTERSTATEMENT OF THE CASE ................................... 3

STATEMENT OF JURISDICTION ............................................... 10

ARGUMENT ............................................................................. 10

I.       RULE 23 AND APPELLATE REVIEW STANDARDS............. 10

II.     THE DISTRICT COURT THOROUGHLY ANALYZED
        PLAINTIFFS' EXPERT EVIDENCE AND FOUND IT
        SUFFICIENT. ................................................................... 13

    A.  The District Court's Analysis of Mangum's Evidence. .............. 14

    B.  The District Court's Analysis of Williams's Evidence. .............. 25

    C.  The District Court's Analysis of Sunding's Evidence. ............... 31

III.   DEFENDANTS' LEGAL ATTACKS ON THE DISTRICT
        COURT'S ORDER SHOULD BE REJECTED. .......................... 33

    A.  Defendants' Averaging And Discounting Arguments Are Legally
        And Factually Unsound. ............................................................ 36

    B.  Neither the REA nor *Tyson* Preclude Use of Averages. ............. 43

    C.  Defendants' Assertions of A Large Number of Uninjured Class
        Members Are Inaccurate. .......................................................... 48

       1.  DPP Model .............................................................. 48

       2.  CFP Models ............................................................. 53

       3.  EPP Models ............................................................. 54

    D.  The DPP Pooled Model Exhibits No "False Positives". ............. 56

    E.  The District Court Ruled That Williams Conclusively Rebutted
        Defendants' Arguments That His Model Generated "False
        Positives." .................................................................... 57

    F.  Defendants' Concerns About How Certification Will Force Them
        To Engage In Expensive Settlements Are Meritless. .................. 58

CONCLUSION ........................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
276 F.R.D. 364 (C.D. Cal. 2011)................................................. 16, 18, 36

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100 (E.D.N.Y.
Oct. 15, 2014) ................................................................................ 4, 38

*Allen v. Dairy Mktg. Servs., LLC*,
No. 5:09-cv-230, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) ................ 56

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................ 12

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)................................................................... 11, 12, 13

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018)............................................................... 49, 51

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
191 Cal. App. 3d 1341 (1987) ................................................................ 29

*In re Blood Reagents Antitrust Litig.*,
No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015).................... 38

*Bouman v. Block*,
940 F.2d 1211 (9th Cir. 1990) .................................................................. 9

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) .................................................................... 4

*In re Capacitors Antitrust Litig.*,
No. 14-cv-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov.
14, 2018) .............................................................................. 16, 18, 36, 39

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D. Mich. 2001) ......................................................... 42

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. 2015) ..................................................... 36, 38

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL No. 1917, 2013 WL 5391159 (N.D. Cal. Sept. 19,
   2013) ...................................................................................................... 38

*Chamberlan v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005) .................................................................. 58

*In re Commercial Tissue Prods. Litig.*,
   183 F.R.D. 589 (N.D. Fla. 1998) ............................................................ 42

*In re Disposable Contact Lens Antitrust Litig.*,
   329 F.R.D. 336 (M.D. Fla. 2018) ..................................................... 36, 42

*In re Domestic Drywall Antitrust Litig.*,
   322 F.R.D. 188 (E.D. Pa. 2017) ....................................................... 36, 47

*In re Elec. Books Antitrust Litig.*,
   No. 11 MD 2293 (DLC), 2014 WL 1282293 (S.D.N.Y.
   March 28, 2014) ................................................................................ 38, 56

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ........................................................... 11, 12

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales
   Practices and Antitrust Litig.*,
   No. 17-md-2785-DDC-TJJ, 2020 WL 1180550 (D. Kan.
   Mar. 10, 2020) ....................................................................... 47, 49, 51

*Freund v. Nycomed Amersham*,
   347 F.3d 752 (9th Cir. 2003) .................................................................. 44

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982).................................................................................. 11

*Giuliano v. Sandisk Corp.*,
   No. C 10-02787 SBA, 2015 WL 10890654 (N.D. Cal. May
   14, 2015) ................................................................................................. 16

*Guido v. L'Oreal, USA, Inc.*,
No. 2:11-cv-01067-CAS, 2014 WL 6603730 (C.D. Cal. July
24, 2014) ............................................................................. 56

*Hawaii v. Standard Oil Co. of Cal.*,
405 U.S. 251 (1972) ........................................................... 33

*Herbert v. Vantage Travel Servs., Inc.*,
No. 17-10922-DJC, 2019 WL 1440400 (D. Mass. Apr. 1,
2019) .................................................................................... 51

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................... 4, 18, 36

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ............................................ 52, 54

*In re Initial Pub. Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) .............................................. 52, 54

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ............................................ 41

*Kleen Prods. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) ....................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ............................................. 49

*In re Korean Ramen Antitrust Litig.*,
No. 13-CV-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan.
19, 2017) ......................................................................... *passim*

*Kotsur v. Goodman Global, Inc.*,
No. 14-1147, 2016 WL 4430609 (E.D. Pa. Aug. 22, 2016) ................... 47

*In re Linerboard Antitrust Litig.*,
MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ................. 33

*In re Lamictal Direct Purchaser Antitrust Litigation*,
957 F.3d 184 (3d Cir. 2020) ........................................... 47, 49

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ................................................. 45

*Leyva v. Medline Indus., Inc.*,
    716 F.3d 510 (9th Cir. 2013) ......................................... 11, 41

*In re Lidoderm Antitrust Litig.*,
    No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb.
    21, 2017) ........................................................................ 45, 49

*In re Live Concert Antitrust Litig.*,
    247 F.R.D 948 (C.D. Cal. 2007) ........................................... 54

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019) ...................................... 51

*In re Loestrin 24 FE Antitrust Litig.*,
    No. 13-2472-WES-PAS, 2019 WL 3214257 (D. R.I. July 2,
    2019) ................................................................................... 36

*Mayo v. USB Real Estate Secs, Inc.*,
    No. 08–00568–CV–W–DGK, 2012 WL 4361571 (W.D. Mo.
    Sept. 21, 2012) ................................................................... 49

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) .............................................. 49

*Mims v. Stewart Title Guar. Co.*,
    590 F.3d 298 (5th Cir. 2009) .............................................. 49

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) .............................................. 45

*Moore v. Apple, Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015) ........................................... 4

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    319 F.R.D. 158 (E.D. Pa. 2016) .......................................... 47

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    No. 06–0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) .................... 56

*In re Myford Touch Consumer Antitrust Litig.*,
No. 13-cv-03072-EMC, 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ............................................................................... 47

*In re Nexium (Esomeprazole) Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015)............................................... *passim*

*Nguyen v. Nissan North Am., Inc.*,
932 F.3d 811 (9th Cir. 2019) ................................................. 41

*In re Optical Disk Drive Antitrust Litig.*,
No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ..................................................................................... 36

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ................................................. 12

*In re Polyester Staple Antitrust Litig.*,
No. 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007) ..................................................................................... 42

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 171 (E.D. Pa. 2015) ...................................... 16, 59

*In re Processed Egg Prods. Antitrust Litig.*,
81 F. Supp. 3d 412 (E.D. Pa. 2015)....................................... 17

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ................................................. 41

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.C. Cir 2017) ...................................... 49

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013).......................................... 49, 56

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019).............................................. 49

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)............................................................... 33

*Resh v. China Agritech, Inc.*,
857 F.3d 994 (9th Cir. 2017) .................................................................. 47

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust*
*Litig.*,
No. 18-md-2819 (NG)(LB), 2020 WL 2555556 (E.D.N.Y.
May 5, 2020) ........................................................................................... 49

*Roes 1-2 v. SFBSC Management, LLC*,
944 F.3d 1035 (9th Cir. 2019) .............................................................. 40

*Rossi v. Standard Roofing, Inc.*,
156 F.3d 452 (3d Cir. 1998) .................................................................. 45

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) .................................................. 17, 34

*Senne v. Kansas City Royals Baseball Corp.*,
934 F.3d 918 (9th Cir. 2019) .................................................................. 13

*Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)................................................................................ 44

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ........................................................... 36

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. C 07-1819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29,
2008) ................................................................................................. 16, 17

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) .............................................................. 12

*Stockwell v. City & Cty. of S.F.*,
749 F.3d 1107 (9th Cir. 2014) .............................................................. 11

*In re: Suboxone (Buprenorphine Hydrochlorine & Naloxone)*
*Antitrust Litig.*,
No. 19-3640, 2020 WL 4331523 (3d Cir. July 28, 2020) ................ 36, 49

*In re Sygenta AG MIR 162 Corn Litig.*,
No. 14-md-2591-JWL, 2016 WL 5371856 (D. Kan. Sept.
26, 2016) ................................................................................................. 47

*Tawfilis v. Allergan, Inc.*,
  No. 8:15-CV-00307-JLS-JCG, 2017 WL 3084275 (C.D.
  Cal. June 26, 2017) ................................................................. 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) .................................... 18, 42

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07–1827 SI, 2012 WL 555090 (N.D. Cal. Feb. 21,
  2012) ....................................................................................... 38

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012) ............................................... 42

*In re Titanium Dioxide Antitrust Litig.*,
  No. RDB–10–0318, 2013 WL 1855980 (D. Md. May 1,
  2013) ....................................................................................... 38

*Torres v. Mercer Canyons, Inc.*,
  835 F.3d 1125 (9th Cir. 2016) .................................... 12, 13, 49

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ............................................... 35, 43, 47

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ................................................. 52

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ........................... 18, 36, 42, 49

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ........................................ 41, 47

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) ............................................. 14

*In re Whirlpool Corp. Front-Loading Washer Prods. Liability
  Litig.*,
  678 F.3d 409 (6th Cir. 2012) ................................................. 49

*Wortman v. Air New Zealand*,
  326 F.R.D. 549 (N.D. Cal. 2018) .......................................... 36

*Yokoyama v. Midland Nat'l Life Ins. Co*.,
594 F.3d 1087 (9th Cir. 2010) ............................................ 41

**Statutes**

15 U.S.C. § 15 ....................................................................... 58

28 U.S.C. § 2072(b) (Rules Enabling Act) ........................... 35, 43

**Other Authorities**

Mary Kay Kane, 7AA Fed. Prac. & Proc. Civ. § 1781 (3d ed. Apr. 2020) ............................................................................ 16

Am. Bar Ass'n, *Proving Antitrust Damages: Legal & Economic Issues* (3d ed. 2017) ........................................................ 25, 45

American Bar Association, *Econometrics: Legal, Practical, and Technical Issues* (2nd ed. 2014) ............................................ 38

Blair & Durrance, "Umbrella Pricing: Antitrust Injury and Standing", *Contemporary Economic Policy* (2018) ................ 25

Department of Justice, *Chicken of the Sea and Bumble Bee Abandon Tuna Merger After Justice Department Expresses Serious Concerns* .................................................................. 4

Department of Justice, *Frequently Asked Questions About The Antitrust Division's Leniency Program and Model Leniency Letters* ................................................................................... 6

Fed. R. Civ. P. 23 ........................................................... *passim*

Fed. R. Civ. P. 39(a)(2) ......................................................... 54

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3rd ed. 2011) ......................................................... 17

United States Constitution Article III ................................... 35, 45

xi

**INTRODUCTION**

If ever an antitrust case was a paradigmatic example of the appropriateness of granting class action treatment under Fed. R. Civ. P. 23(a) and 23(b)(3), it is this case. After a three-day evidentiary hearing, and the careful examination over many months of nine briefs and supporting papers totaling around 1,500 pages, the district court issued an exhaustive 59-page published opinion certifying three separate damage classes: (1) a class of direct purchasers of packaged tuna products under the Sherman and Clayton Acts ("DPPs"); (2) a class of indirect purchaser commercial food preparers who used those products ("CFPs"); and (3) a class of indirect end payer purchasers of those products ("EPPs"). The indirect classes were certified for claims under various states' antitrust or consumer protection laws.

This case involves a hardcore price-fixing conspiracy, established through direct evidence, among the leading manufacturers of packaged tuna in the United States: StarKist Co. ("StarKist"), Tri-Union Seafoods LLC (d/b/a Chicken of the Sea) ("COSI"), and Bumble Bee Foods LLC ("Bumble Bee").[1] Their guilt is established not only by discovery in this case but also

---

[1] Bumble Bee, a formerly profitable operation, has been serially bought and sold by private equity firms for over a decade. Because of its owners' systematic use of debt financing to extract cash from the company, by 2019,

1

by two corporate guilty pleas (by StarKist and Bumble Bee), three individual guilty pleas by their executives, a corporate leniency application by COSI to the United States Department of Justice ("DOJ"), and a criminal jury verdict against Chris Lischewski ("Lischewski"), Bumble Bee's former CEO. In the Bumble Bee and StarKist cases, the DOJ issued victim notification letters to counsel for the Classes,[2] and, rather than seeking criminal restitution, deferred to the civil proceedings to provide restitution to these victims. Thus, there is no dispute that the domestic Defendants are all adjudged or admitted felons. The corporate guilty pleas foreclose any dispute that their conduct harmed members of the Classes, as further reflected in DOJ's sentencing statements.

The district court, however, did not merely rely on these admissions. Nor did it merely wholesale adopt the conclusions of the Classes' three well-respected experts — all of which separately found widespread impact as a result of the cartel's conduct. Instead, the district court conducted a rigorous analysis of the arguments and evidence in support of and against

---

Bumble Bee could no longer manage its debt, criminal fines, or other unsecured obligations. In November of 2019, it filed for bankruptcy, and FCF Co., Ltd. acquired its assets.

[2] *United States v. StarKist Co.*, 18-cr-00513-EMC-1, ECF No. 8 (N.D. Cal.) ("*StarKist*"); *United States v. Bumble Bee Foods, LLC*, No. 17-cr-00249-EMC, ECF No. 5 (N.D. Cal.) ("*Bumble Bee*").

2

class certification, including each of the Class experts' opinions and those of the defense experts. The district court resolved the "battle of the experts" to the extent that their opinions conflicted on questions relevant to class certification, painstakingly explaining why it found the defense experts' criticisms of each Class expert to be *unpersuasive*.

Defendants, however, contend that the district court erred — in their view — when it noted that the trier-of-fact will ultimately decide whose experts are most credible. They also attack the district court's resolution of the central predominance issue they raise here: that the Class experts presented what Defendants derisively call an "average" overcharge, which Defendants claim conceals numerous uninjured Class members and allegedly produces "false positives". Defendants' characterizations of the record are false. The district court did not abuse its discretion in certifying the Classes, and its order should be affirmed.

## ISSUE TO BE DECIDED

Did the district court abuse its discretion in certifying the Classes at issue in this case?

## COUNTERSTATEMENT OF THE CASE

This appeal should be placed in the context of what has happened over the last five years. A court's consideration of class certification is a holistic

analysis that often considers the strength of the expert evidence presented in support of a certification motion and other common evidence establishing liability.[3]

In December of 2014, Bumble Bee announced its intention to acquire COSI and presented the proposed merger to the DOJ for review. During the review process, evidence of the cartel was uncovered, and DOJ began investigating the packaged tuna industry for potential antitrust violations. The first class action was filed in August of 2015. By December of 2015, the merger was cancelled, and DOJ issued a press release in which former Assistant Attorney General William Baer stated: "[c]onsumers are better off without this deal…. Our investigation convinced us — and the parties knew or should have known from the get go — that the market is not functioning competitively today, and further consolidation would only make things worse."[4]

---

[3] *See Butler v. Sears, Roebuck & Co*., 727 F.3d 796, 801 (7th Cir. 2013); *Moore v. Apple, Inc*., 309 F.R.D. 532, 544 (N.D. Cal. 2015); *In re High-Tech Emp. Antitrust Litig*., 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) ("*High-Tech*"); *In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *43 (E.D.N.Y. Oct. 15, 2014), *adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("*Air Cargo*").

[4] Department of Justice, *Chicken of the Sea and Bumble Bee Abandon Tuna Merger After Justice Department Expresses Serious Concerns*, available at https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious.

During the DOJ's criminal investigation, COSI sought leniency from the government and provided evidence against StarKist and Bumble Bee. *See* Suppl. Excerpts of Record ("SER") 1. To obtain leniency, COSI had to admit to its felony violation of the antitrust laws.[5]

Thereafter, the government commenced a series of prosecutions against StarKist and Bumble Bee executives, as well as the corporations themselves. Three executives pled guilty to price-fixing of packaged tuna, which extended from at least 2011 through at least 2013: (1) Walter Scott Cameron, Bumble Bee's former Senior Vice-President of Sales (SER24); (2) Kenneth Worsham, Bumble Bee's former Senior Vice-President of Trade Marketing (SER37); and (3) Stephen Hodge, StarKist's former Senior Vice-President of Sales (SER50).[6] Bumble Bee pled guilty to the conspiracy in May of 2017 and was fined $25 million. SER4.[7] StarKist pled guilty to the conspiracy in 2018 and was fined $100 million, the statutory maximum.

---

[5] DOJ, *Frequently Asked Questions About The Antitrust Division's Leniency Program and Model Leniency Letters*, available at https://www.justice.gov/atr/page/file/926521/download.

[6] *See United States v. Worsham*, No. 3:16-cr-00535-EMC-1 (N.D. Cal.); *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal.); *United States v. Hodge*, No. 17-cr-0297-EMC (N.D. Cal.).

[7] *See Bumble Bee*, ECF No. 25. The fine amount was heavily discounted due to Bumble Bee's financial situation, but would have increased to $81 million upon a sale of the company under certain circumstances.

SER73.[8] The guilty pleas, at paragraphs 4(a), expressly state that Defendants' misconduct "affect[ed]" U.S. customers, totaling "at least" hundreds of millions of dollars. In both instances, the DOJ noted that it was not seeking restitution because of the pending civil proceedings.[9]

Additionally, the DOJ criminally prosecuted Lischewski, Bumble Bee's former CEO,[10] and on December 3, 2019, a jury found that he had conspired with StarKist and COSI to fix packaged tuna prices in violation of the Sherman Act.[11]

In this litigation, Bumble Bee responded to an interrogatory about its agreements with competitors as follows:

> [T]here were certain agreements among Bumble Bee, Chicken of the Sea, and StarKist that existed during the time period between the first quarter of 2011 and the fourth quarter of 2013. . . . .
>
> First, Senior Vice Presidents of the Sales and Trade Marketing departments at Bumble Bee coordinated certain list price increases relating to certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist) that occurred between the first quarter of 2011 and the fourth quarter of 2013.

---

[8] *See StarKist*, ECF No. 24.

[9] SER11, 80.

[10] SER63. *See United States v. Lischewski*, No. 18-cr-00203-EMC (N.D. Cal.) ("*Lischewski*").

[11] *Lischewski*, ECF No. 640 at 2.

. . . Bumble Bee announced three list price increases during the relevant period (on March 10, 2011, January 17, 2012, and March 30, 2012) that were the result of such coordination.

Second, Senior Vice Presidents and Vice Presidents of the Sales and Trade Marketing departments at Bumble Bee coordinated certain promotional levels and changes to certain pricing guidance on certain canned tuna products through a series of bilateral communications with executives at the other companies (including, at various times, communications with Steve Hodge and Chuck Handford of StarKist and Mike White of Chicken of the Sea). These communications occurred episodically between the first quarter of 2011 and the fourth quarter of 2013. . . .

Third, as an additional basis for the Company's guilty plea, the Company acknowledged that certain documents and information suggest that the CEOs of Bumble Bee and Chicken of Sea coordinated with respect to certain promotional pricing on certain canned tuna products during 2013.

SER93.

Similarly, in its interrogatory responses, COSI furnished the following chart of unlawful agreements concerning packaged tuna products:

| Nature of Agreement | Time Period | Individuals with Information |
|---|---|---|
| Agreement between Bumble Bee and COSI to reduce the size of cans from 6 oz to 5 oz for branded tuna products | As early as March 2008 | John Sawyer, Shue Wing Chan |
| Agreement among Bumble Bee and COSI on timing of list price increase for branded tuna products | As early as June 2008 | Mike White, John Sawyer, Shue Wing Chan |
| Agreement among Bumble Bee and COSI on timing of net price increase for branded tuna products | As early as May 2010 | Mike White, John Sawyer, Shue Wing Chan |
| Agreement among Starkist, Bumble Bee and COSI on timing of list and/or net price increase for branded tuna products | As early as February 2011 | Mike White, John Sawyer, Shue Wing Chan |
| Agreement among Starkist, Bumble Bee and COSI on timing of list price increase for branded tuna products | As early as November 2011 | Mike White, John Sawyer, Shue Wing Chan |
| Agreement among Bumble Bee and COSI not to aggressively discount products through promotions for branded tuna products | As early as November 2011 | Shue Wing Chan |
| Agreement among Starkist, Bumble Bee and COSI not to produce a branded, FAD-Free Product | As early as February 2012 | John Sawyer, Shue Wing Chan |

SER102. The individuals listed worked for COSI.

All three plaintiff groups filed motions for class certification in May of 2018. Three respected economists from different shops offered declarations in support of the motions: Dr. Russell Mangum ("Mangum") (DPPs), Dr. Michael Williams ("Williams") (CFPs), and Dr. David Sunding ("Sunding") (EPPs). Defendants countered with two experts, both from Edgeworth Economics: Dr. John Johnson ("Johnson") (responding to Mangum) and Dr. Laila Haider ("Haider") (responding to Sunding and

Williams). The parties submitted a total of nine briefs on class certification, nine declarations, and hundreds of exhibits.

The Ninth Circuit does not require that a district court hold a hearing on class certification (*Bouman v. Block*, 940 F.2d 1211, 1232 (9th Cir. 1990)); nonetheless, the district court held a three-day evidentiary hearing on January 14-16, 2019, allocating a full day to each proposed class. All five experts appeared and were subject to direct and cross-examination. While lawyer arguments were made, the district court told counsel, "[l]et's cut to the chase. We are here to talk about the differences in the experts and the methodology." Excerpts of Record ("ER") 312. The court said that "[r]ecognizing the importance of the experts' role in certifying the classes, the Court focused at the hearing on the models that each expert put forward to prove that common evidence could show impact to the Class members." ER4.

The district court did not rush to judgment, but instead carefully considered the record. The 59-page class certification opinion was not issued until July 30, 2019.

While Defendants did not move to strike the testimony of the Class experts, the district court independently assessed the reliability and probative value of their opinions, saying that Rule 23 "commands" "a hard look at the

9

soundness of statistical models that purport to show predominance." ER10. The court added that "Rule 23 may require the Court to determine whether the expert's evidence supporting certification is in fact persuasive, and may also require the Court to resolve factual disputes between dueling experts, if their disagreements pertain to whether the class plaintiffs can prove impact." ER11.

The district court then examined each Class expert's analysis and the defense expert's criticisms thereof. It evaluated the expert evidence in the context of "the record evidence, and the guilty pleas and admissions entered in this case." ER17. It determined that, in light of all the evidence, Plaintiffs' experts and analyses were more persuasive. The district court ultimately certified a class of DPPs under the Sherman Act and classes of CFPs and EPPs under California and other states' laws. ER5, 26, 46, 58.

In sum, the district court conducted exactly the type of "rigorous analysis" of the class certification evidence that fully comports with precedents in this Circuit and elsewhere.

## **STATEMENT OF JURISDICTION**

Plaintiffs concur with Defendants' statement of jurisdiction.

## **ARGUMENT**

## I.    **RULE 23 AND APPELLATE REVIEW STANDARDS**

A plaintiff seeking class certification must meet the four threshold requirements of Fed. R. Civ. P. 23(a), as well as the requirements for one or more of the three types of classes identified in Rule 23(b). *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 512 (9th Cir. 2013) ("*Leyva*"). Here, Plaintiffs sought certification under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action is the superior means of adjudication versus a series of individual actions. In this appeal, Defendants focus ***only*** on whether the Rule 23(b)(3) predominance requirement has been satisfied.

In assessing predominance, as with the other Rule 23 requirements, a district court must conduct a "rigorous analysis" to determine whether to certify a class. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). The "rigorous analysis" requires "judging the persuasiveness of the evidence presented" for and against certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) ("*Ellis*").

In ruling on class certification, "[m]erits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. *455*, 466 (*2013*) ("*Amgen*"). The likelihood of overlap with the merits is "no license to

11

engage in free-ranging merits inquiries at the certification stage." *Id.*; *see Stockwell v. City & Cty. of S.F.*, 749 F.3d 1107, 1111 (9th Cir. 2014); *Ellis*, 657 F.3d at 983 n.8.

Similarly, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.' What the rule does require is that common questions 'predominate over any questions affecting only individual [class] members.'" *Amgen*, 568 U.S. at 469 (citation omitted; brackets in original). As the Supreme Court has stated, "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

The grant or denial of class certification is reviewed by this Court for an "abuse of discretion" and the findings of fact on which it relied are reviewed for "clear error." *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016) ("*Torres*"); *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014). "An abuse of discretion occurs when the district court . . . relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1018 (9th Cir. 2011) (quoting *Wolin v. Jaguar Land Rover N. Am.,*

*LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010)). This Court has held that "[w]hen reviewing an order granting class certification, 'we accord the district court noticeably more deference than when we review a denial.'" *Torres*, 835 F.3d at 1132 (quoting *Abdullah v. U.S. Sec. Assocs. Inc.*, 731 F.3d 952, 956 (9th Cir. 2013)); *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019).

## II. THE DISTRICT COURT THOROUGHLY ANALYZED PLAINTIFFS' EXPERT EVIDENCE AND FOUND IT SUFFICIENT.

The district court properly analyzed the correct factors in considering class certification and found Plaintiffs met their burden. It acknowledged the "rigorous analysis" requirement and cited *Amgen* in acknowledging it should consider merits questions only as they are relevant to the prerequisites for class certification under Rule 23. ER5. Although the Rule 23(a) requirements were largely uncontested, it examined each and found them satisfied. ER6-8, 27-29, 47. Defendants do not dispute those rulings. As for Rule 23(b)(3)'s requirements, the district court found the prerequisite of superiority satisfied, and Defendants do not contest that finding. ER29, 39, 54-55. For each of the Classes, the district court focused on Rule 23(b)(3)'s predominance requirement, as Defendants do here. ER8-24, 29-39, 47-55.

13

On this issue, the district court primarily considered the competing expert testimony on (a) antitrust violations, (b) impact to the Classes, and (c) damages. ER9. It said:

> [T]he *Daubert* standard is not the only hurdle for expert testimony at the class certification stage — the rigorous analysis required by Rule 23 may require the Court to determine whether the expert's evidence supporting certification is in fact persuasive, and may also require the Court to resolve factual disputes between dueling experts, if their disagreements pertain to whether the class plaintiffs can prove impact.

ER11 (citing *Ellis*, 657 F.3d at 980). It proceeded to carefully consider the expert analyses of Mangum, Williams, and Sunding — along with Johnson and Haider's criticisms — to determine which expert was more persuasive on each point. Below, Plaintiffs summarize the district court's analysis for each pair of competing experts.

**A. The District Court's Analysis of Mangum's Evidence.**

The district court first examined and found that common evidence could resolve the existence of the conspiracy on a classwide basis. It found that given the guilty pleas, the documents memorializing communications among the co-conspirators, Mangum's evidence of market structure, and his detailed analysis of record evidence consistent with cartel behavior, this element was readily satisfied. ER9.[12] Defendants' expert, Johnson, never

---

[12] *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 109 (E.D.N.Y.

contended otherwise. Defendants do not contend that this determination was clearly erroneous.

As for common impact, the district court said that the DPPs must establish that all *or* nearly all DPP Class members suffered harm as a result of Defendants' anticompetitive conduct. ER30. In making this determination, the court said it had to take a "hard look at the soundness of statistical models that purport to show predominance" and whether "the proffered expert testimony has the requisite integrity to demonstrate class-wide impact." ER10.

---

2012) (in price-fixing cases, "courts have frequently held that the predominance requirement is satisfied because the existence and effect of the conspiracy are the prime issues in the case and are common across the class"); *In re Capacitors Antitrust Litig.*, No. 14-cv-03264-JD, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) ("*Capacitors*") ("as many courts have noted, the claim of a conspiracy to fix prices inherently lends itself to a finding of commonality and predominance, even when the market involves different products and prices."); *Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) ("whether there has been an antitrust violation is a common issue rather than an individual one. In no event will the individual circumstances of particular class members be relevant to the inquiry of whether such a violation has occurred."); Mary Kay Kane, 7AA Fed. Prac. & Proc. Civ. § 1781 (3d ed. Apr. 2020) (in price-fixing conspiracy cases, "[p]roof of the conspiracy is viewed as the central issue … because if it is established, all the class members will be allowed to recover. In short, whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3).").

The district court then turned to Mangum's impact assessment. Mangum reported that he had performed: (a) an economic analysis of industry structure, as well as (b) an empirical statistical analysis; he concluded, based on this analysis, that all or "nearly" or "virtually" all of the DPP Class was impacted by the conspiracy. ER582, 593, 1921, 2020.

As the district court acknowledged, Mangum's industry structure analysis encompassed:

> the dominant level of market share Defendants['] control; the barriers to entry because of the high capital investment costs, industry knowledge, distribution arrangements between Defendants, and brand awareness; the collaborative relationship between Defendants and the ability to communicate with each other; standardized products sold, and common costs shared, by all Defendants; Defendants' use of price lists; and the fact that tuna is a staple good with inelastic demand.

ER12 (citations omitted). Many courts have relied on economic analysis of industry structure to find that antitrust injury in price-fixing cases is susceptible to classwide proof under Rule 23(b)(3).[13]

Next, the district court considered Mangum's empirical statistical analysis using Defendants' *own* transactional sales data.

---

[13] *See, e.g.*, *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016) ("*Kleen*"); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 184-86 (E.D. Pa. 2015) ("*Eggs*"); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 370-72 (C.D. Cal. 2011) ("*Auto Lighting*"); *In re Static Random Access Memory* (*SRAM) Antitrust Litig.*, No. C 07-1819 CW, 2008 WL 4447592, at *5-6 (N.D. Cal. Sept. 29, 2008).

*First*, Mangum performed price correlations across various products, various Defendants, and customer types, and found that "there is a high degree of correlation between Defendants' prices in several relevant dimensions, all of which support a finding of common impact." ER1997.[14] This came as no surprise; at the class certification hearing, Mangum cited the testimony of COSI's Mike White, who said that the Defendants' pricing would always be close because they faced the same market dynamics and the same input costs across the products they produced. ER585-87.

*Second*, Mangum developed a "reduced form regression model" (called the "Pooled DPP Model") to estimate overcharges as a result of the conspiracy. ER12-13. The court acknowledged this is a "widely used econometric technique for determining whether prices were higher during a class period than they otherwise would have been without anti-competitive conduct." ER12 (internal quotations omitted); *see* ER590-91 (Mangum

---

[14] Correlation analyses are a recognized form of econometric evidence on which courts rely in determining class certification. *E.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 431 (E.D. Pa. 2015); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005) ("*Rubber Chemicals*"); *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017) ("*Ramen*"); *SRAM*, 2008 WL 4447592, at *6.

testimony).[15] *See also* ER596-99, 1999-2010 (Mangum's discussion of his regression model).

At a basic level, Mangum's regression analysis involves comparing pricing before the conspiracy (when prices were competitive), with pricing during the conspiracy (when prices were not competitive), and then measuring the delta in percentage terms between the two, holding the other major factors affecting price constant. This is called the "overcharge" percentage in antitrust economics. The Pooled DPP Model ultimately generated a "coefficient" for the conspiracy's impact, which is the percentage by which class member transactions were overcharged. Mangum presented this in an explanatory demonstrative to the district court during the class certification hearing (SER110):

---

[15] Multiple regression analysis is commonly used at class certification to show that impact is capable of being proven by common evidence. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence*, at 260 (3rd ed. 2011), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf; *see also, e.g.*, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260-61 (10th Cir. 2014) ("*Urethane*"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 606 (N.D. Cal. 2010) ("*TFT-LCD I*"); *High-Tech*, 985 F. Supp. 2d at 1212; *Auto Lighting*, 276 F.R.D. at 373-74; *Capacitors*, 2018 WL 5980139, at *5-6; *Ramen*, 2017 WL 235052, at *16 (certifying a class where Mangum was the plaintiffs' expert). As Mangum noted, Johnson himself previously endorsed regressions of the type Mangum used here. ER1348 (citing *In re Pool Prods. Distrib. Market Antitrust Litig.*, MDL No. 2328, 2016 WL 2756437, at *4-5 (E.D. La. May 12, 2016)).

18



The model is called a "Pooled" model, because it includes data from COSI, StarKist, and Bumble Bee and yields one overcharge finding for the transactions of all three. As the district court noted: "[u]nder his base regression model, Dr. Mangum concludes that COSI, StarKist, and Bumble Bee charged prices above the level that legitimate competitive factors would explain and shows a statistically significant overcharge, likely caused by collusive behavior, at an estimate of 10.28%." ER14.

The district court and Mangum referred to the Pooled DPP Model as his "base" model, because he also adjusted its specifications to test its ability to measure impact across a number of relevant dimensions identified in Defendants' internal business records. SER115; *see, e.g.*, SER134. As the

district court specifically noted: "[t]o ensure the findings of Dr. Mangum's analyses 'are not overly sensitive to the specific model [he] chose, [Mangum] subjected the base DPP Model to **several robustness tests** by introducing changes to the model's specifications.'" ER14 (emphases added). Specifically, to test the model's "robustness" — *i.e.*, its ability to measure impact across the DPP Class — Mangum built statistical analyses to estimate overcharges specific to StarKist, COSI, and Bumble Bee, as well as overcharges separately based on fish type, package type, customer type, and for private label products. ER2014-18. He also performed an additional cross-check on his Pooled DPP Model to verify that it was measuring widespread impact across the Class. In this further cross-check, Mangum simply compared actual prices paid by each of the DPP Class members to those prices predicted by his Pooled DPP Model, and he found that 1,111 out of 1,176 of direct purchasers (94.5%) had at least one purchase higher than the predicted prices in the "but for" world free of Defendants' collusion. ER611-12, 2019.[16] As Mangum said in his initial report, "[c]ollectively, these robustness checks demonstrate the reliability and appropriateness of

---

[16] Mangum modified this additional cross-check by adding "customer fixed effects" — *i.e.*, he added an explanatory variable for every DPP Class member to his Pooled DPP Model and then performed the comparison described above again. That modification implied that 97.2% of DPP Class members had at least one purchase above the predicted price for packaged tuna in a "but for" world free of collusion. ER612-13, 2103.

20

[his] Pooled DPP Model for estimating damages to direct purchasers[.]"
ER2018; *see also* ER608-10.

Johnson claimed to identify flaws in Mangum's modeling, only two of
which Defendants raise here: (1) Johnson argued that use of the Pooled DPP
Model results in an "average" overcharge, which might mask large numbers
of uninjured Class members, and (2) Johnson argued that Mangum's
regression model generates supposed "false positives" when run on
transactions involving non-defendant tuna, which Johnson contends means
that there must be a flaw in the model's specifications (though he never
identifies it).

**Pooled DPP Model**. The district court considered and rejected
Johnson's econometric attack on the Pooled Model. To challenge Mangum's
Pooled Model, Johnson essentially modified it so the overcharge coefficient
could vary for each DPP Class member. His results purport to show that
only 72% of the 604 DPP Class members exhibited a positive overcharge.[17]
ER15. But as Mangum pointed out, and the district court rightly noted,
Johnson's modification had inherent limitations: (1) not all DPP Class

---

[17] Johnson and Mangum count class members differently: Johnson counted
604 total DPP Class members; Mangum counted 1176 DPP Class members.
The difference is generally attributable to whether subsidiary and related
companies are consolidated with their parent or counted separately. The
difference in approach is not material to this appeal.

members purchased in both a competitive period and the conspiracy period, and thus no results could be generated for them, and (2) Johnson necessarily relied on *far fewer* observations than Mangum to estimate the conspiracy's effect on each Class member, thereby increasing his model's susceptibility to measurement error. *See infra* at 37-38 (discussing problems with small sample sizes).

As Mangum reported, and as the district court expressly recognized, Johnson's approach yielded *no results* at all for 61 Class members, and it only provided statistically significant results for 442 Class members. ER16; SER129, 131. But even then, "looking at all customers that produced any type of result in Dr. Johnson's model — statistically significant or not — *94% had positive overcharges*." ER16 (emphases added). In other words, even Johnson's model implies that at least 94% of DPP Class members were impacted in some amount, and the percent impacted increases to 98.5% when only the statistically significant results are considered. Mangum depicted this visually at the class certification hearing:



SER131.[18]

Furthermore, the fact that 61 Class members yielded no results under Johnson's approach is not a concession that they were unimpacted by the conspiracy. In fact, although Johnson's model was mathematically incapable of generating an overcharge coefficient on these 61 Class members because these customers lacked benchmark data, Mangum nonetheless reviewed their purchase prices and found that "the majority of customers that Dr. Johnson claims are not impacted purchased at least one product during the Class

---

[18] Mangum also found that, under Johnson's approach, the vast majority of DPP Class members with "insignificant" or "negative" results had *under* 20 observations, which creates reliability problems based on small sample sizes. *See* ER1366-67 (summarized at Table 11).

Period at a price higher than or equal to the average price impacted customers paid." ER1368.

The district court thus ultimately found that "these Class members would still be able to point to [Mangum's] econometric model as it pertains to similarly situated Class members as proof. This, along with the record evidence, guilty pleas, and market characteristics, shows that all Class members will still use common evidence and that common questions will continue to predominate over the case." ER17; *see also Kleen*, 831 F.3d at 928 (plaintiffs "have shown actual price increases, a mechanism for those increases, the communication channels the conspirators used, and factors suggesting that cartel discipline can be maintained. We are not saying that any of these points have been proven, of course, but . . . this evidence is enough to support class treatment of the merits.").

**"False Positives."** The district court also rejected Johnson's contention that applying Mangum's model to purchases of packaged tuna sold by non-Defendants also yielded overcharges, and that this fact suggested that there was some misspecification in the Pooled DPP Model. ER19. Mangum was unsurprised by these overcharge results and offered a response based on well-established economic theory, which the district court found persuasive. Specifically, when a cartel fixes prices, other producers

take advantage of this and similarly raise their prices under a "price umbrella" created by the cartel. *Id.*; *see* Am. Bar Ass'n, *Proving Antitrust Damages: Legal & Economic Issues* at Part III, Ch. 8, Sec. E(3) (3d ed. 2017); Blair & Durrance, "Umbrella Pricing: Antitrust Injury and Standing", *Contemporary Economic Policy*, vol. 36, pp. 241-254 (2018). Furthermore, Johnson assumed — wrongly as it turned out — that the allegedly "false positive" transactions he identified involved non-Defendant tuna. In reality, a substantial number of these transactions involved *Defendant* tuna. ER19-20.

> At bottom, the district court concluded:

> Ultimately, Defendants have not persuaded the Court that Dr. Mangum's model is unreliable or incapable of proving impact on a class-wide basis. The evidence put forward by the DPPs, including Dr. Mangum's regression model, supplemented by the correlation tests, the record evidence, and the guilty pleas and admissions entered in this case, is sufficient to show common questions predominate as to common impact. The DPPs have therefore met their burden.

ER24.

## B. The District Court's Analysis of Williams's Evidence.

The district court's opinion considering Williams's analysis illustrates that he greatly exceeded the threshold required for granting class certification to be appropriate. The district court made factual findings in its

25

analysis that preclude Defendants from arguing that Williams's methodology constituted "averaging," as Defendants assert. Over 60% of the foodservice-size packaged tuna product commerce purchased by CFP Class members was analyzed in assessing impact by Williams via regression analysis on a customer-by-customer basis. ER1876-80. This granular analysis cannot be said to represent any kind of "averaging" approach. To the contrary, Defendants fail to cite any evidence showing varied effects or lack of effects on CFP Class members, even though they obtained discovery from the major foodservice tuna distributors that sold to CFP Class members.

In fact, the district court ultimately found Williams's methodology and impact conclusions to be persuasive and robust, even when assuming *arguendo* the validity of Haider's criticisms. ER37-38 ("[i]mportantly, even assuming Dr. Haider is correct and that the data used should be limited, her model in fact still finds positive and statistically significant pass-through rates for all Class distributors when the data used is limited to the class period.").

The district court systematically assessed and ultimately approved of a variety of Williams's analyses that underpin the district court's finding of predominance. In assessing predominance, the district court first concluded

that common questions will predominate with respect to determining whether a violation of antitrust laws occurred, basing this finding on Williams's evidence of multiple guilty pleas, documents, testimony, and various forms of economic analysis. ER30. Defendants do not contend that this finding is clearly erroneous.

In assessing the second prong of the predominance element required for class certification, the district court found that Williams conducted a two-step methodology in which he first "determine[d] whether common evidence and analyses c[ould] be used to determine whether the agreement generally inflated prices to the Class above competitive levels." ER31. In assessing impact at this first level, Williams analyzed sales made to the six specific intermediaries (Costco, Sysco, U.S. Foods, Sam's Club, Walmart, and DOT Foods) that resold larger, foodservice-size packaged tuna products to CFP Class members. Defendants do not contest that Williams's methodology and analyses show that the six specific direct purchaser intermediaries from which CFP Class members purchased were impacted by the conspiracy in their purchases of foodservice-size packaged tuna products.

The district court also analyzed and found persuasive the second part of Williams's two-step methodology, in which he estimated the proportion

27

of overcharges paid by these six intermediaries that were passed on to CFP Class members and then found widespread impact of overcharges on CFP Class members. Using regression models, Williams concluded that that the six class distributors passed through the overcharges paid by them to CFP class members at rates ranging from 92% to 113%. ER33. In and of itself, that the six intermediaries that sold foodservice-size packaged tuna products to CFP Class members passed on approximately 100% of the overcharges that they paid suggests that all CFP Class members were impacted by Defendants' conspiratorial conduct.

In analyzing whether common evidence and analyses can be used to determine whether any such general price inflation caused all or virtually all CFP Class members to pay more for at least one purchase of foodservice-size packaged tuna than they would have paid but for the agreement, Williams conducted two additional, independent analyses: (1) various modified regressions coupled with market evidence; and (2) CFP Class member-specific overcharge regressions. ER33. For his first analysis, he started with the same regression model used to detect overcharges, but modified the model to analyze classwide impact on Class members. ER33. These regressions were varied to compute overcharges by product, by large distributor, by state, by combinations of individual Defendants and

individual Class distributors, and for each Class distributor by product or by state. ER33. Using these varied regressions, Williams found that Class members experienced overcharges at rates ranging from 95.7% to 100%. ER33. The district court described how, under this first analysis, Williams also looked to evidence concerning the canned tuna market generally in assessing common impact. In particular, the district court pointed Williams's observation that packaged tuna products are not altered in any way throughout the distribution chain. ER33. This characteristic supports a presumption of classwide impact. *See B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1352–53 (1987). Additionally, Williams noted that the six relevant intermediaries operate in a competitive industry, and that basic economic theory demonstrates that the more competitive an industry is, the higher the pass-through rate becomes. ER33-34.

The second analysis Williams conducted to show classwide impact consisted of Class member-specific regressions. ER33. Williams adapted his base overcharge regression model to evaluate overcharges for each proposed class member as a further test to determine whether all, or nearly all, Class members suffered impact. ER34. Thus, for over 60% of the packaged tuna product commerce sold to CFP Class members, Williams used regression

analysis to detect impact on a class member-by-class member basis. ER1876-80. Using this method, Williams concluded that, based on the Sysco and US Foods data, **99.3% and 99.5% of these distributors' customers experienced overcharges**, respectively. ER34. This analysis was as granular as possible, and Defendants fail to posit any major, additional analyses that Williams should have undertaken in assessing classwide impact.

Defendants cite conclusory statements from their class certification opposition briefing to support the proposition that some CFP Class members are distributors. *See* Appellant's Opening Brief ("OB") 24. The district court considered and was ultimately unpersuaded by this argument. ER35-36. Furthermore, Defendants failed to show that the pass-on defense is available in a situation like this one, where no entities downstream of the CFP Class members have sued. In finding Defendants' arguments unpersuasive, the district court noted, "[t]he distribution chain and product involved in this case is not complicated and the amount of potential sales passed through is relatively manageable." ER35.

Defendants point to the substantial percentage of foodservice-size tuna sold as private label. They fail to note, however, first, that many of the unbranded large cans were traceable to the price-fixers; and second, that the prices class members paid were higher than expected market prices, even

30

though there were unbranded substitutes partially available. ER36 This is a common circumstance, but the figures prove the cartel's effect.

Ultimately, the district court reviewed Defendants' criticisms of Williams's methodologies at length and found them unpersuasive. ER34-38 ("Defendants have not persuaded the Court that Williams' model is unreliable or incapable of proving impact on a class-wide basis.").

### C. The District Court's Analysis of Sunding's Evidence.

The district court reviewed Sunding's conclusion that an antitrust violation occurred, finding that it was evidence common to the Class and that common evidence of violation would predominate. ER48. The court then turned to impact and discussed Sunding's own overcharge regression model, which used slightly different model specifications than the models Mangum and Williams employed, but nevertheless produced similar overcharge results. ER49 (describing Sunding's separate explanatory variable choices).

After reviewing his overcharge model, the district court described the work Sunding did to ensure that the results of the model were not masking important differences in the direct purchaser population by running "sensitivity tests." The court referred to Paragraph 112 of Sunding's report, and to his testimony, which described methods to "reality check" the model

results instead of simply "assuming that the overcharges [were] positive everywhere in the market." ER50. The district court described the sensitivity tests as "a comparison of the overcharge percentages to Defendants' profit margin"; as additional regression models that "evaluate whether the overcharge varied when focusing on specific products and package type"; and as a model showing that the collusion impacted large customers, using Wal-Mart transactional data. The court held that "these analyses confirm the initial model's findings." ER50.

The district court noted that defense expert Haider raised many of the same criticisms of Sunding's work that she had made of Williams's analysis, and declined to "rehash" the analysis of those critiques (ER51), but instead addressed several unique points, finding that mere disagreements about particular results within the model did not call into question the viability of the model to demonstrate common impact. ER52.

Finally, the district court considered Sunding's pass-through analysis, noting that it was based on economic literature and also on Defendants' internal documents, and finally on regression modeling "in the form of multiple economic models . . . using retail scanner data from consumer purchases and data from individual retail firms." ER50. The court

summarized Sunding's conclusion, that "direct purchasers passed the overcharges they paid on to the end payers." ER52.

The district court then considered and dismissed each criticism Haider leveled at the pass-through analysis. Rather than ignoring such pricing practices as loss leader pricing and focal-point pricing, Sunding "discusses both" and "tested his findings in his Reply Report . . . to ensure his findings were correct – his tests confirm his initial conclusions." ER52-53. The court found assertions of geographic and product variation "unavailing" because Sunding had "persuasive explanations" and the "robust studies relied on by Dr. Sunding, including two studies based on IRI data and seven studies based on retailer and distributor data" compared favorably to other cases. ER53. The Court concluded that "Dr. Haider's critiques do not reveal underlying problems … that preclude certification." *Id*.

The district court, in all, concluded that Sunding had put forth a method that was "reliable and capable of proving impact." ER54.

## III. DEFENDANTS' LEGAL ATTACKS ON THE DISTRICT COURT'S ORDER SHOULD BE REJECTED.

Before responding to Defendants' arguments, Plaintiffs start with a point that Defendants completely ignore: private antitrust actions have long been recognized as a valuable tool in enforcing the antitrust laws. *See Reiter*

*v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262, 266 (1972). "'[T]he private attorney general' is particularly important in the area of antitrust enforcement because public policy relies so heavily on such private action for enforcement of the antitrust laws." *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *17 (E.D. Pa. June 2, 2004) (citing *Alpine Pharma., Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir.), *cert denied sub nom. Patlogan v. Dickstein, Shapiro & Galligan*, 414 U.S. 1092 (1973)).

This is particularly true for antitrust class actions involving price-fixing claims. "Courts have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." *Rubber Chems.*, 232 F.R.D. at 350 (internal quotations and citation omitted). These principles certainly apply here, where the DOJ has sent victim notifications to counsel for the class counsel and stated that it has not sought restitution for victims because it expected that such restitution would be obtained through the civil proceedings.

Turning to Defendants' Opening Brief, Defendants raise several arguments against certification.

*First*, they argue that Plaintiffs' use of single average overcharges masks individualized differences among class members and thus cannot support certification. OB32-35. Defendants contend that this conclusion is supported by the fact that wholesale packaged tuna prices are often individually negotiated and that tuna is often purchased at discounts off of list prices, which vary depending upon the direct purchaser's negotiating ability. OB6-8, 42-44.

*Second*, as a corollary argument, Defendants contend that demonstrating classwide impact through the presentation of an average overcharge across the class would violate the Rules Enabling Act (28 U.S.C. § 2072(b)) ("REA") and Article III of the United States Constitution. OB35-37. Defendants further assert that *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ("*Tyson*") demonstrates that class certification should not have been granted here. OB37-41.

*Third*, Defendants argue that the district court erred in finding that Rule 23(b)(3)'s predominance requirement was satisfied because they contend the Court should have conclusively determined whose experts were most persuasive concerning questions of common impact across the classes. OB50-52. Defendants argue that the district court said this issue was for the jury. OB52-55. They also accuse the district court of allegedly imposing

upon them the burden prove that Plaintiffs' experts' models were not capable of proving common impact. OB56.

*Fourth*, Defendants contend that alleged "false positives" asserted by Johnson suggest that there must be some — albeit unidentified — flaw in Mangum's Model that warrants its rejection. OB51-52.

*Finally*, Defendants contend that upholding certification would place them under a "great pressure" to settle in order to avoid a potentially costly trial. OB57-59.

None of these arguments have merit.

## A. Defendants' Averaging And Discounting Arguments Are Legally And Factually Unsound.

Regression modeling in antitrust class actions has been a standard tool for many years. To develop such models, plaintiffs collect data on class purchases that were allegedly subject to the anticompetitive conduct and then generate an aggregate, classwide overcharge amount. The *vast majority* of federal courts have accepted this practice in connection with both class certification and trial of antitrust cases.[19]

---

[19] *See, e.g., In re: Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, No. 19-3640, 2020 WL 4331523, at *5 (3d Cir. July 28, 2020) ("*Suboxone*"); *Kleen*, 831 F.3d at 929; *Urethane*, 768 F.3d at 1251 n.3; *High-Tech*, 985 F. Supp. 2d at 1217-18; *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 377-78 (M.D. Fla. 2018) ("*Contact*

Nonetheless, "attacking averaged data" has become "a standard defense tactic in antitrust cases, so it is unsurprising that courts have often evaluated and approved the appropriate use of averages." *CRT*, 306 F.R.D. at 328. Indeed, a common defense tactic in attempting to defeat certification of an antitrust class action — which Defendants employed here — is to insist that an overcharge must be calculated separately for each class member or subsets of class members and in doing so, slice the data into smaller and smaller pieces. One district court explained why reasoned

---

*Lenses*"); *Wortman v. Air New Zealand*, 326 F.R.D. 549, 559-60 (N.D. Cal. 2018); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 226-27, 234-35 (E.D. Pa. 2017) ("*Drywall*"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 628 (N.D. Cal. 2015) ("*CRT*"); *In Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 183 (D. Mass. 2013), *aff'd*, 777 F.3d 9 (1st Cir. 2015) ("*Nexium*"); *Auto Lighting*, 276 F.R.D. at 372; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614 (N.D. Cal. 2009); *In re Loestrin 24 FE Antitrust Litig.*, No. 13-2472-WES-PAS, 2019 WL 3214257, at *13, 16 (D. R.I. July 2, 2019); *Capacitors*, 2018 WL 5980139, at *7; *Ramen*, 2017 WL 235052, at *16-17; *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016); *In re Blood Reagents Antitrust Litig.,* No. 09-2081, 2015 WL 6123211, at *8 (E.D. Pa. Oct. 19, 2015); *Air Cargo*, 2014 WL 7882100, at *61-62; *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 WL 1282293, at *30-31 (S.D.N.Y. Mar. 28, 2014) ("*E-Books*"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5391159, at *6 (N.D. Cal. Sept. 19, 2013); *In re Titanium Dioxide Antitrust Litig.*, No. RDB–10–0318, 2013 WL 1855980, at *16-17 (D. Md. May 1, 2013); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07–1827 SI, 2012 WL 555090, at *7 (N.D. Cal. Feb. 21, 2012) ("*TFT-LCD II*").

averaging is more reliable than blindly slicing the data into smaller and smaller pieces:

> [T]he Ninth Circuit has recognized that the use of aggregate data in regression analysis is often appropriate "where [a] small sample size may distort the statistical analysis and may render any findings not statistically probative." *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002) [("*Paige*")] (amended). In such a case, the use of "aggregate numbers" may "allow for a [more] robust analysis and yield more reliable and more meaningful statistical results." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012), appeal dismissed (Jan. 16, 2013). *See also In re High–Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 580 (N.D. Cal. 2013). The Court finds that the DPPs have presented a functioning model tailored to the facts of the case, using aggregate data to produce a coherent, efficient model based on the available data, and avoiding the risk of using overly granular data sets that would have produced unreliable or statistically meaningless data. *See id.*

*CRT*, 308 F.R.D. at 628.

Indeed, the American Bar Association published a leading monograph warning against the defense tactic of disaggregating data too much:

> [B]ecause the number of observations per grouping declines as transactions are divided into more and more subgroups, coefficients become less precise, which makes a test of coefficient stability or robustness less reliable. . . . [T]he effects of potential outliers on regression estimates increase as the number of observations available to estimate each separate coefficient decreases. As a result, estimated coefficients may make little economic sense even if they have been estimated precisely.

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, at 359-60 (2nd ed. 2014) ("*Econometrics*").

Thus, when Defendants contend that overcharges must be calculated on a customer-by-customer basis, courts often reject that approach. For example, in another case, when Johnson made the same arguments he asserts here, the court rejected them, stating:

> [D]efendants demand too much. In effect, they argue that DPPs must prove that each and every putative class member was harmed before certification can be granted. But Rule 23 does not require proof of impact on each purchaser before a class can be certified. *Kleen Products LLC v. International Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016). Rule 702 and *Daubert* do not require what Rule 23 does not. In addition, the prevailing view, which the Court agrees with, is that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *Urethane*, 768 F.3d at 1254. Setting the certification bar at the extreme height defendants propose would almost certainly kill off most antitrust class actions well before an adjudication of the merits of the case.

2018 WL 5980139, at *7.

As noted more fully above, the district court found that Mangum directly addressed any concern that his Pooled DPP Model might be masking significant numbers of uninjured Class members. For example, Mangum conducted several robustness checks to estimate overcharges specific to StarKist, COSI, and Bumble Bee, and he also estimated

overcharges separately based on fish type, package type, *customer type*, and for private label products. ER2014-18. He explained, "[o]nce again, the overarching outcome is the same: Every estimated overcharge for every customer type is large, positive, and statistically significant. These results once again provide evidence that the Pooled DPP Model is appropriate for the broader class of direct purchasers." ER2018; ER1999 (based on his correlation analysis, Mangum concluded that "[t]hese results strongly suggest that a price-fixing conspiracy among Defendants would have common impact and affect all customers, regardless of type."). Mangum also addressed Johnson's claims that certain customers experienced "negative" overcharges, finding those customers had fewer than 10 observations, thereby raising the concerns about small sample sizes expressed in the econometric texts referenced above. ER1367. In every case, Mangum's regression modeling established that the anticompetitive conduct of StarKist, COSI, and Bumble Bee resulted in large and statistically significant overcharges.[20]

---

[20] Defendants attempt to use evidence that was not part of class certification record to undermine Mangum's analysis, including: (a) various depositions of executives of Direct Action Purchasers ("DAPs") (typically large wholesalers or chain retailers), who filed separate individual antitrust actions (ER1092-1199); and (b) expert declarations for certain DAPs who claimed different overcharges than the DPP Class, often well exceeding 10.28% (ER996-1002, 1237-60, 1261-76). OB33 & n.12. The Court should not

There are certainly variations in the *magnitude of overcharges* suffered by various customer type, but the *injury* element is satisfied if class members suffered any positive overcharges. Thus, an overcharge for one or more purchases during the class period is sufficient to establish antitrust injury. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015); *Tawfilis v. Allergan, Inc.*, No. 8:15-CV-00307-JLS-JCG, 2017 WL 3084275, at *13 (C.D. Cal. June 26, 2017). This Circuit has made it abundantly clear that differences in the *amount* of damages suffered by each class member do not defeat predominance under Rule 23(b)(3).[21]

Likewise, the district court found that EPPs' expert, Sunding, had succeeded in using his own separate model and robust sensitivity tests to ensure that the direct purchasers were overcharged. Defendants respond by repeatedly asserting that he found otherwise. OB19-20. This is untrue. Sunding testified that these purported results were merely artifacts of quirks in Defendant data, such as the changes in internal classifications of retailers,

---

consider any of this new evidence on this appeal, which was not presented to the district court in conjunction with class certification. *See Roes 1-2 v. SFBSC Management, LLC*, 944 F.3d 1035, 1050 n.13 (9th Cir. 2019).

[21] *See, e.g.*, *Nguyen v. Nissan North Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ("*Vaquero*"); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014); *Leyva*, 716 F.3d at 512; *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).

and that once normal data cleaning was performed, Sunding's model produced positive and statistically significant overcharges for every one of the top ten retailers. ER399-400.

With respect to customer-specific discounting, Defendants (joined by *amicus* Chamber of Commerce ("CoC")) advance a flawed legal argument that wholesale prices are varied in the packaged tuna market and are often individually negotiated. As courts have recognized, "even if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants." *In re Commercial Tissue Prods. Litig.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998).[22] Mangum so testified at the class certification hearing. ER588-89.

Moreover, Defendants ignore what Plaintiffs' experts *actually did* to address the issue of individualized discounting. Mangum used the Defendants' own data, their *net packaged tuna prices on a transaction by*

---

[22] Many other courts are in accord. *See, e.g.*, *Urethane*, 768 F.3d at 1254; *Contact Lenses*, 329 F.R.D. at 386; *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 346 (D. Md. 2012); *TFT-LCD I*, 267 F.R.D. at 605; *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345–47 (E.D. Mich. 2001); *In re Polyester Staple Antitrust Litig.*, No. 3:03CV1516, 2007 WL 2111380, at *23 (W.D.N.C. July 19, 2007).

*transaction basis*, in his econometric model. As Mangum explained, his model accounted for "all possible deductions such as discounts, promotions, returns, etc., that could be properly and reasonably applied." SER119 (emphasis in original); *see* ER603-04, 2006; *Kleen*, 831 F.3d at 928 (crediting expert regression that "analyzed 'industry-wide reflections of price and actual prices paid by class members before and after' the price-increase announcements"). Thus, he accounted for the varied nature of wholesale pricing of packaged tuna in his Pooled Model *before he subjected that model to the multiple robustness checks described above to confirm widespread impact to the Class*.

Sunding similarly accounted for promotions and rebates. Furthermore, Williams studied prices actually paid by class members for packaged tuna products, and Defendants have failed to point to discounts that his analysis failed to consider.[23]

### B. Neither the REA nor *Tyson* Preclude Use of Averages.

---

[23]Defendants also cited no record evidence for the proposition that any CFP purchasers received price protection or unusually large discounts despite suggesting that bargaining power or ability to negotiate might have varied among CFP class members. *See* OB12 ("A large restaurant chain will pay very different prices than Bo Diddley's Pub & Deli in St. Cloud, Minnesota."). However, Defendants' hypothetical argument is misconceived, because Williams analyzed whether overcharges were passed through to class members on a customer-by-customer, transaction-by-transaction basis via regression analysis for over 60% of the CFP class member commerce. ER1876-80.

Defendants' arguments (joined by their *amici*) about the REA and *Tyson* are also meritless.

The REA provides that procedural rules cannot "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). But no right is abridged here. A class certification ruling favorable to Plaintiffs does not prevent Defendants from taking the case to trial and prevailing in front of a jury after subjecting Plaintiffs' experts to searching cross-examination. As the Supreme Court has said:

> The test is not whether the rule affects a litigant's substantive rights; most procedural rules do. What matters is what the rule itself regulates: If it governs only "the manner and the means" by which the litigants' rights are "enforced," it is valid; if it alters "the rules of decision by which [the] court will adjudicate [those] rights," it is not. Applying that test, we have rejected every statutory challenge to a Federal Rule that has come before us.

*Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (citations omitted); *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 762 (9th Cir. 2003) (same).

Here, Mangum — and both of the other Class experts — found that Defendants' conduct injured all or nearly all DPP Class members. As described above, one cross-check of Mangum's Pooled DPP Model implied that, at most, 5.5% of direct purchasers paid prices less than predicted but-

44

for prices. That commerce tempers the overcharge found by Mangum, and thus its inclusion in the Pooled DPP Model benefits Defendants, rather than harms them. However, if it became necessary for Mangum to remove certain direct purchasers (and their commerce) from his Pooled DPP Model at (or before) trial, he could easily do so. *See, e.g.*, *Nexium*, 777 F.3d at 32 n.28 ("[w]hile the Act would preclude recovery for uninjured class members, it imposes no requirement at the class certification stage beyond ensuring that a methodology can be developed that is capable of excluding uninjured members"); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *24 (N.D. Cal. Feb. 21, 2017) ("*Lidoderm*") ("in estimating aggregate damages plaintiffs have shown how purchases attributable to class members who were not damaged can be excluded on a classwide basis . . . and therefore avoid any Rule 23 or Rules Enabling Act problem").[24]

A further point about the REA concerns the 61 purchasers in the DPP Class who only purchased during the conspiracy period, not during the competitive period. Because there is no benchmark data for these purchasers, regression modeling cannot estimate individualized results, and therefore, as the district court noted (and as quoted above), these customers

---

[24] These same considerations also dispose of any argument based on Article III of the Constitution.

can make use of the DPP model to present their impact and damage claims.[25]

ER17. For them, *not* permitting use of the DPP Model *would* abridge their

rights to present their claims at trial, in violation of the REA. Indeed,

Johnson admitted on cross-examination that customers with few or no

benchmark transactions could use the experience of those who did have such

transactions as a yardstick by which to measure impact and damages.

ER745.

As for *Tyson*, the Supreme Court expressly approved what it called

"representative evidence" (including statistical studies) at class trials, such

as the DPP Model. In *Vaquero*, a case involving state minimum wage laws,

this Court read *Tyson* broadly:

> As the Court made clear in *Tyson* []: "[*Dukes*] does not stand
> for the broad proposition that a representative sample is an
> impermissible means of establishing classwide liability." *Tyson*
> [], 136 S. Ct. at 1048. "In a case where representative evidence

---

[25]  In the non-class context, courts routinely permit antitrust plaintiffs to prove impact arising from allegedly anticompetitive conduct by benchmarking the experience of other similarly situated market participants. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851-52 (5th Cir. 2015) (affirming use of competing firm's higher gross-profit margin as yardstick because firm was reasonably similar to plaintiff); *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003) ("an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities."); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 486 (3d Cir. 1998) (yardstick comparison of profits to reasonably similar business "is sufficient to establish [antitrust] causation"); Am. Bar Ass'n, *Proving Antitrust Damages: Legal & Economic Issues* 246 (3d ed. 2017).

> is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class. To so hold would ignore the Rules Enabling Act's pellucid instruction that use of the class device cannot 'abridge any substantive right.'" *Id.* at 1046 (ellipsis omitted).

824 F.3d at 1156. While *Tyson* was a Fair Labor Standards Act case, subsequent courts have deemed its discussion of "representative evidence" instructive in other situations, including antitrust, product liability, and securities class actions.[26] Certainly, *Tyson* is consistent with the longstanding practice in antitrust class actions to permit the reasonable use of average overcharges to resolve the question of classwide impact and damages, as described above, so long as they do not mask substantial numbers of differently situated and uninjured class members.[27]

---

[26] *See, e.g., Resh v. China Agritech, Inc.*, 857 F.3d 994, 1004 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 1800 (2018) (securities class action); *Drywall*, 322 F.R.D. at 217 (antitrust class action); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 204 (E.D. Pa. 2016) (antitrust class action); *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *40 n.44 (D. Kan. Mar. 10, 2020) ("*EpiPen*") (antitrust and deceptive advertising class action); *In re Myford Touch Consumer Antitrust Litig.*, No. 13-cv-03072-EMC, 2016 WL 7734558, at *17 (N.D. Cal. Sept. 14, 2016) (defective vehicle class case); *Kotsur v. Goodman Global, Inc.*, No. 14-1147, 2016 WL 4430609, at *7 (E.D. Pa. Aug. 22, 2016) (defective product class case); *In re Sygenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *7 (D. Kan. Sept. 26, 2016) (product liability class action).

[27] The CoC suggests that in *In re Lamictal Direct Purchaser Antitrust*

### C. Defendants' Assertions of A Large Number of

### Uninjured Class Members Are Inaccurate.

#### 1. DPP Model

"[E]ven a well-defined class may inevitably contain some individuals

who have suffered no harm as a result of a defendant's unlawful conduct."

*Torres*, 835 F.3d at 1136.[28] This Circuit has not opined on the issue of how

---

*Litigation*, 957 F.3d 184 (3d Cir. 2020), the Third Circuit rejected the reasoned use of averages to resolve the question of impact on a classwide basis. That, however, was not the court's holding. While the Third Circuit did not fully explain the experts' modeling choices there, its decision to reverse certification turned on the fact that the plaintiffs' expert's "model still relies on an *average* hypothetical price, which again fails to account for individual negotiations or the effect of GSK's Contracting Strategy on each Direct Purchaser." *Id.* at 193. In contrasting the plaintiff's expert's approach to that of the defense expert, the panel noted that the defendants' expert used actual transactional prices, rather than hypothetical ones, and had accounted for the competitive effects of a unique contracting strategy that bore heavily on the two defendants' pricing decisions just prior to and during the class period at issue in that case. *Id.* That analysis purportedly showed that most of a readily identifiable subset of the proposed class (25 of 33 customers that only purchased generic versions of Lamictal) were not injured. *Id.* But the Third Circuit's concerns are not relevant here because Mangum and the other experts used actual transaction prices and also performed multiple robustness checks to verify that the conspiracy's effects were widespread across the class. This is far more than is required for class certification in this straightforward antitrust action. *See Suboxone*, 2020 WL 4331523, at *5 (decided after *Lamictal*: "Purchasers' theory of injury and damages is provable and measurable by an aggregate model relying on class-wide data"). As described above, Mangum further demonstrated that Johnson's customer-by-customer model *also* established that the conspiracy harmed all or virtually all Class members.

[28] Other circuit courts are in accord. *See Kleen*, 831 F.3d at 927; *Urethane*, 768 F.3d at 1267, *aff'g*, 2013 WL 2097346, at *2 (D. Kan. May 15, 2013);

many "uninjured" class members must exist before a class becomes uncertifiable. Two circuit courts have suggested that if the number of uninjured class members is 10% or more, a class cannot be certified. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624-25 (D.C. Cir. 2019) ("*RF II*") (12.7% of class members conceded to be uninjured by plaintiffs' own expert); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018) ("*Asacol*") (noting that the district court assumed that 10% of class members would be uninjured). These courts and others have been reluctant to set any definitive upper limit on the number of uninjureds that would make a class uncertifiable. *Messner*, 669 F.3d at 825 ("There is no precise measure for 'a great many.' Such determinations are a matter of degree, and will turn on the facts as they appear from case to case.").

Conversely, a number of courts have held that if a class contains 5% to 6% uninjured members, that figure is *de minimis* and certification can be

---

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012); *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 678 F.3d 409, 420 (6th Cir. 2012), *vacated*, 569 U.S. 901 (2013), *reinstated*, 722 F.3d 838 (6th Cir. 2013), *cert. denied*, 571 U.S. 1196 (2014); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 307−08 (5th Cir. 2009); *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009). The CoC's contrary contention at pages 15-17 of its brief is thus contrary to settled law. The only court that arguably supported that position was the D.C. Circuit in *dicta* in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) ("*RF I*"). But in *RF II*, that Circuit withdrew from that position. 934 F.3d at 624.

granted.[29] Here, one of Mangum's robustness checks for his Pooled DPP Model implied that at most 5.5 percent of class members always paid prices lower than the predicted but-for prices (2.8% if customer fixed effects are applied). ER610, 612-13 (noting that this robustness check was a confirmatory test and should not be construed as Mangum's common impact opinion). This confirmatory check demonstrates that the number of uninjured Class members is *de minimi*s and is therefore no impediment to class certification. Moreover, unlike in *Asacol*, Mangum does not concede lack of injury to any portion of the Class, and instead, based on the totality of his various analyses, concludes that "all or virtually all" of the Class was injured in some amount.[30]

---

[29] *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137 (D.C. Cir 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) (suggesting a class with a range of 5% to 6% uninjured members would be certifiable); *Nexium*, 297 F.R.D. at 179 (D. Mass. 2013) (predominance not defeated where proposed class had 5.8% uninjured members); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2819 (NG)(LB), 2020 WL 2555556, at *11-12 (E.D.N.Y. May 5, 2020) (finding that a class containing 5.7% uninjured members could be certified); *EpiPen*, 2020 WL 1180550, at *34–36 (class contained approximately 5% uninjured members); *In re Lidoderm*, 2017 WL679367, at *17 (finding that three uninjured class members out of a class totaling 55 members (5.5%) was certifiable); *Mayo v. USB Real Estate Secs, Inc.*, No. 08–00568–CV–W–DGK, 2012 WL 4361571, at *3 (W.D. Mo. Sept. 21, 2012) (finding that a class where "at least 94%" of its members were injured was not overbroad, but declining class certification on other grounds).

[30] Defendants rely heavily on *Asacol*, but it has been distinguished or rejected by subsequent courts. *See, e.g.*, *In re Loestrin 24 FE Antitrust Litig.*,

Plaintiffs agree it was their burden to persuade the district court that common issues, generally, predominated over individual ones. The district court expressly found that Plaintiffs met their burden by showing that questions of impact predominate over individualized ones. ER24 ("[t]he evidence put forward by the DPPs, including Dr. Mangum's regression model, supplemented by the correlation tests, the record evidence, and the guilty pleas and admissions entered in this case, is sufficient to show common questions predominate as to common impact. The DPPs have therefore met their burden."). Defendants seize on the preceding sentence in the class certification opinion to suggest that the district court required them to prove that Plaintiffs were incapable of proving impact on a class-wide basis. That contention wholly mischaracterizes the court's detailed recitation of the dueling opinions of the experts, and the fact that Johnson's criticisms of Mangum's modeling were ultimately unpersuasive to the court as it evaluated whether Plaintiffs had met their burden under Rule 23. The district

---

410 F. Supp. 3d 352, 401-02, 404-05 (D.R.I. 2019); *EpiPen*, 2020 WL 1180550, at *31; *Herbert v. Vantage Travel Servs., Inc*., No. 17-10922-DJC, 2019 WL 1440400, at *6 (D. Mass. Apr. 1, 2019). Moreover, *Asacol* deals with factual issues of injury and damages specific to the complex interplay of generic substitution laws, as well as the role of insurers, insureds, manufacturers, distributors, pharmacies, and pharmacy benefit managers in the distribution and fulfillment of a prescription for medication that are not applicable to straightforward sale of packaged tuna through the distribution chain.

court did *exactly* what the Ninth Circuit instructs be done in these circumstances and committed no abuse of discretion.

Defendants also focus on the district court's statements that Johnson's criticisms of Mangum's impact analysis were "ripe for use at trial" and "could be persuasive to a finder of fact[,]" but "determining which expert is correct is beyond the scope of this Motion." ER19, 23. They argue that it was the province of the judge, not the jury, to decide which expert was right. They contend that the jury will not be asked to review the class certification decision. That latter point is true, but the jury *will* be asked to decide if each Class expert's testimony at any trial is sufficient to show injury and damages to the Class. In that sense, it will be the ultimate arbiter of whether classwide harm is demonstrated.

There is nothing improper about this situation, because "the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008) ("*Hydrogen Peroxide*").

The *Hydrogen Peroxide* court continued:

[a] contested requirement is not forfeited in favor of the party seeking certification merely because it is similar or even

identical to one normally decided by a trier of fact. Although
the district court's findings for the purpose of class certification
are conclusive on that topic, they do not bind the fact-finder
on the merits. A court's determination that an expert's opinion is
persuasive or unpersuasive on a Rule 23 requirement does not
preclude a different view at the merits stage of the case.[31]

*Id.* at 318. This is common sense, and the district court's indication that the

jury would have the final say here is fully consistent with the existing

caselaw.

### 2. CFP Models

Defendants do not assert the existence of any uninjured CFP Class

members, instead relying only on other arguments against the CFP Class.

OB20-21. Although Defendants dispute that all direct purchaser class

members were impacted, CFPs only must show impact to the six purchasers

---

[31] *Accord In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 39, 41 (2d Cir.
2006) ("*IPO*") ("[T]he determination as to a Rule 23 requirement is made
only for purposes of class certification and is not binding on the trier of
facts, even if that trier is the class certification judge." (*citing Gariety v.
Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004)) ("A trial judge's
finding on a merits issue for purposes of a Rule 23 requirement no more
binds the court to rule for the plaintiff on the ultimate merits of that issue
than does a finding that the plaintiff has shown a probability of success for
purposes of a preliminary injunction"); *Unger v. Amedisys Inc.*, 401 F.3d
316, 323 (5th Cir. 2005) ("[T]he court's determination for class certification
purposes may be revised (or wholly rejected) by the ultimate factfinder[.]");
*In re Live Concert Antitrust Litig.*, 247 F.R.D 948, 114 (C.D. Cal. 2007)
(following *IPO*). The implications of Defendants' proposed articulation of
the district court's duties on class certification are far reaching and would
result in the court definitively resolving a disputed issue of fact — the
question of impact and, in this case, damages. *See* Fed. R. Civ. P. 39(a)(2).

from which they purchased, and Defendants do not contest that Williams's analysis demonstrates impact to any of these six intermediaries. OB17-19. With regard to pass-through, the district court found that Williams's analyses withstood, and were even unaddressed by, the criticisms of Defendants' expert. *See supra* at 25-30.

### 3. EPP Models

The district court independently found that Sunding's model provided a reliable way of proving impact to the end users. ER54. The centerpiece of Defendants' response (OB19-20) is to mislead the Court about his results. In the days leading up to the evidentiary hearing, Sunding expanded his market power sensitivity tests of WalMart by performing a similar analysis of the top ten retailers, finding that each of them demonstrated a statistically significant, positive overcharge for each of the three defendant tuna firms. ER364. Defendants seize on the inconsequential result that when the model is run over data for certain of the retailers without accounting for unrelated coding errors and inconsistencies in their data. However, when Sunding examined the data taking into account these peculiarities, *each* retailer showed significant overcharges.[32] ER772-73.

---

[32] Sunding explained the data quirks that required individualized cleaning: "[CostCo] switched from having a variety of can sizes to everything sold as CostCo was a 7-ounce can . . . when I control for the effect of the change in

Defendants' second attack is to assert that Sunding assumes that pass-through is 100% across the entire market. OB20. This also is misleading, to the point of misrepresenting the record. Sunding created multiple models to test pass-though: using a national scanner database for multichannel outlets, and one for convenience stores (ER2208-27) [¶¶145-153]; and seven using Wal-Mart data; Sam's Club; Kroger; Harris Teeter; Roundy's; Trader Joe's; and Core-mark (a distributor to convenience stores) (ER2213-27) [¶¶154-173]. He set forth pass-through elasticity for each.[33] For example, Sunding presented the pass-through elasticity for WalMart separately for each state [ER2217, Table 5]. The results of these data analyses showed that overcharge at the wholesale level translated to a retail price increase that

---

the can size, I get a positive and statistically significant overcharge[.]" ER362. "Chicken of the Sea changed the data code that it used to categorize Target right during the middle of the cartel period, and that has nothing to do with reality." ER363.

[33] Elasticities relate the percentage change in the retail price to the percentage change in the wholesale price, which is the method common to academic literature, but since the retail price is at a markup to the wholesale price, the resulting change to the retail price will be larger than the change to wholesale price that it responds to, even at elasticities below 1.0. Sunding explained (ER369) that an elasticity of .9 would mean that an increase in wholesale price from $1.00 to $1.10, at a thirty percent retail markup, would result in a $.12 retail increase. Elasticities throughout Sunding's nine models were positive and statistically significant, and either at or near 1.0, or high enough and at margins where the resulting retail change from the wholesale overcharges were larger than the wholesale overcharges themselves, or 100% pass-through. ER385, 370-71, 2212-2288.

universally exceeded the size of the wholesale increase. Then (and only then) did Sunding make the conservative assumption that pass-through was at a rate of 100%; having shown that it was typically greater and universally at least equal, he assumed 100%.

Defendants' refusal to deal honestly with this argument is most profound where they assert (OB20) that "he assumed a superstore like Wal-Mart passed through an overcharge at exactly the same rate as a local grocery …" Sunding tested Wal-Mart, and found a pass-through over 100% in every Class state. ER2217 [Table 5]. He tested over 2000 local groceries and found a pass-through at 100% at every single store, using Kroger, Roundy's, and Harris Teeter data, which were available at the individual store level. ER2223-24 [¶ 166]; *see* ER378. He then "assumed", having found that the threshold was exceeded, that they both passed on 100% of the overcharge.

### D. The DPP Pooled Model Exhibits No "False Positives".

Defendants briefly claim that the district court ignored Johnson's argument that the Pooled DPP Model exhibited "false positives." OB51-52. The concern with false positives (*i.e.*, that the model finds overcharges when it shouldn't) was raised *in RF I*. There, plaintiffs' model allegedly demonstrated antitrust impact *before* the challenged conspiracy commenced.

Since then, it is a rare antitrust case where some defense expert does not advance the theory that "false positives" plague the plaintiffs' expert's certification analysis. Many subsequent decisions, however, have confined the discussion in *RF I* to the particular facts of that case.[34]

Here, Johnson hypothesized that an unidentified methodological flaw is embedded in the Pooled DPP Model and that this alleged flaw is responsible for generating false positives. But, as the district court found, Johnson's "false positives" argument ignores the previously discussed "umbrella effect" whereby non-conspirators in a market match the higher prices being charged for the same product. Johnson's argument also ignores that some of the purchases on which he bases his criticism were, in fact, *Defendant* tuna. Mangum discusses these points at length in his reply report in support of class certification. ER1300-17.

### E. The District Court Ruled That Williams Conclusively Rebutted Defendants' Arguments That His Model Generated "False Positives."

---

[34] *See, e.g.*, *Ramen*, 2017 WL 235052, at *16-17; *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06–0620, 2015 WL 5767415, at *14 (E.D. Pa. July 29, 2015); *E-Books*, 2014 WL 1282293, at *22; *Guido v. L'Oreal, USA, Inc.*, No. 2:11-cv-01067-CAS (JCx), 2014 WL 6603730, at *13 (C.D. Cal. July 24, 2014); *Allen v. Dairy Mktg. Servs., LLC*, No. 5:09-cv-230, 2013 WL 6909953, at *17 n.9 (D. Vt. Dec. 31, 2013).

The district court also considered and rejected Defendants' assertion that Williams's methodology resulted in "false positives" for substantially the same reasons that it rejected those arguments when made against Mangum. ER34-35 ("[w]hile subtle differences exist, the same reasoning for why the Court rejected those arguments above applies with equal force here."). The district court further found that Williams conclusively rebutted the arguments advanced by Defendants. ER37 ("[m]oreover, , Dr. Williams provides reasons grounded in economic theory for why Defendants' concerns are **misleading and incorrect**.") (emphases added).

### F. Defendants' Concerns About How Certification Will Force Them To Engage In Expensive Settlements Are Meritless.

Defendants' (and their *amici's*) final point is that if the district court's certification order is not overturned, there will be enormous pressure on them to engage in expensive settlements to avoid trial and the potential of a treble damage verdict. This argument should be rejected.

*First*, this argument could be made in every antitrust class action, but that has not prevented courts from certifying such classes. Indeed, it is United States' established policy to award antitrust victims treble damages

to fully compensate them and to deter such behavior in the future. 15 U.S.C. § 15.

*Second*, Defendants' claims that they will have to settle or face a potentially calamitous judgment are overblown. A similar point was made in *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 960 (9th Cir. 2005), where the Ninth Circuit said the defendant's assertions about facing an "all or nothing" class trial were unavailing where it failed to show that it would be forced to settle regardless of the case's merits or that it lacked the resources to defend the case to its conclusion and any appeal. The same point applies here. Defendants have paid for dozens of expensive lawyers over five years of litigation and have not demonstrated they cannot continue to do so. StarKist recently attempted to convince the criminal court that accepted its plea to lower the statutory fine on the basis that it could not afford to pay a $100 million criminal fine and settle its remaining exposure in this litigation. After a series of hearings and briefing, the criminal court expressly noted that StarKist did have sufficient assets to pay a $100 million fine *and* to satisfy its obligations to the Classes. *StarKist*, ECF Nos. 180-81. Moreover, COSI and StarKist's respective parent entities (and co-Defendants) are well-heeled enough to pay the continuing costs of defense and any judgment.

*Third*, given the important public policy underlying the use of private class actions to enforce the antitrust laws and DOJ's statements that the crime victims here should look to the civil proceedings to obtain restitution, it would be inequitable to deny certification, because Defendants do not wish to be "pressured" to pay for their admittedly felonious conduct.

*Fourth*, of late, many defendants in antitrust class actions have gone to trial, and it is simply not the case that there is an inevitable "hydraulic" pressure to settle these litigations even if the claims are unmeritorious. The recent *defense* verdicts in the *Ramen*, *Nexium*, and *Eggs* cases reflect this reality.

*Finally*, the notion that the persuasiveness of a plaintiff's model of antitrust impact and damages will never effectively be tested before a jury is fallacious. As noted above, a jury is free to reject classwide damage and impact claims, even if a district court has certified them.

For these reasons, Defendants' arguments about "pressure to settle" cannot be a basis to reverse the grant of class certification.

## **CONCLUSION**

Defendants identify no abuse of discretion in the district court's thorough order assessing the extensive evidentiary record before it and

granting class certification under Fed. R. Civ. P. 23(a) and 23(b)(3). That order should be affirmed.

Dated: August 14, 2020

Respectfully submitted,

By: *s/ Michael P. Lehmann*
Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
Samantha J. Stein
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980

*Lead Counsel for the*
*Plaintiffs-Appellees Direct*
*Purchaser Plaintiffs Class*

By: *s/ Betsy C. Manifold*
Betsy C. Manifold
Rachele R. Byrd
Marisa C. Livesay
Brittany N. Dejong
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
Thomas H. Burt
270 Madison Avenue
New York, New York 10016

Telephone: 212/545-4600
Facsimile: 212/545-4653

*Lead Counsel for
Plaintiffs-Appellees End Payer
Plaintiffs Class*

By: *s/ Jonathan W. Cuneo*
Jonathan W. Cuneo
Blaine Finley
CUNEO, GILBERT & LADUCA
LLP
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960

*Lead Counsel for the
Plaintiffs-Appellees Commercial
Food Preparer Class*

## SIGNATURE ATTESTATION

I, Betsy C. Manifold, hereby attest pursuant to Circuit Rule 25-5(e) that all other parties on whose behalf this filing is submitted concur in the filing's content.

Dated: August 14, 2020          *s/ Betsy C. Manifold*
                                 Betsy C. Manifold

26630

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because this brief contains 13,569 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14- point Times New Roman type.

Dated: August 14, 2020                    *s/ Betsy C. Manifold*
                                          Betsy C. Manifold

# ADDENDUM

**ADDENDUM TO PLAINTIFFS-APPELLEES'
JOINT ANSWERING BRIEF**

**TABLE OF CONTENTS**

**Statutes**                                                              **Page**

Fed. R. Civ. P. 39……………...………………………………………..1

Except for the following, all applicable statutes, etc., are contained in the statutory addendum submitted Appellants-Defendants.

\*\*\*

**Rule 39. Trial by Jury or by the Court**

(a) When a Demand Is Made. When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury unless:

(1) the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record; or

(2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.

(b) When No Demand Is Made. Issues on which a jury trial is not properly demanded are to be tried by the court. But the court may, on motion, order a jury trial on any issue for which a jury might have been demanded.

(c) Advisory Jury; Jury Trial by Consent. In an action not triable of right by a jury, the court, on motion or on its own:

(1) may try any issue with an advisory jury; or

(2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for a nonjury trial.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

| **9th Cir. Case Number(s)** | 19-56514 |
|---|---|

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Plaintiffs-Appellees' Joint Answering Brief

| **Signature** | s/ Betsy C. Manifold | **Date** | 8/14/2020 |
|---|---|---|---|

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                 *Rev. 12/01/2018*